789 F.2d 1308
 The STATE OF NORTH DAKOTA, ex rel. BOARD OF UNIVERSITY AND
SCHOOL LANDS, Appellee,
v.
John R. BLOCK, Secretary of Agriculture; James G. Watt,
Secretary of the Interior; Robert F. Burford, Director of
the United States Bureau of Land Management; and R. Max
Peterson, Chief of the United States Forest Service, Appellants.
 No. 84-2664.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 9, 1985.
Decided May 5, 1986.
 
 Marcy A. Toney, Washington, D.C., for appellants.
 Nicholas J. Spaeth, Bismarck, N.D., for appellee.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 This case comes before us a second time on appeal. We reverse and remand with directions to dismiss the complaint.
 
 FACTS
 
 2
 On October 31, 1978, the State of North Dakota brought this action seeking to enjoin the United States from issuing mineral leases on lands constituting the riverbed of the Little Missouri River or otherwise exercising ownership over the riverbed. On March 11, 1980, the state amended its complaint to include as a basis of jurisdiction the Quiet Title Act (QTA), 28 U.S.C. Sec. 2409a (1982). The district court held that the Little Missouri River was navigable in 1889, the year that North Dakota entered the Union, and that North Dakota had thus acquired title to the riverbed under the equal footing doctrine and the Submerged Lands Act of 1953. 43 U.S.C. Sec. 1311(a) (1982). The district court further held that the twelve-year statute of limitations contained in the QTA did not apply to the states. North Dakota ex rel. Board of University and School Lands v. Andrus, 506 F.Supp. 619 (D.N.D.1981). This court affirmed the district court on both issues. North Dakota ex rel. Board of University and School Lands v. Andrus, 671 F.2d 271 (8th Cir.1982). On certiorari, the United States Supreme Court reversed, holding that the QTA provides the exclusive means by which a party can challenge the United States' title to real property and that the twelve-year statute of limitations set forth in the QTA applies to the states. The Court remanded the case for a determination regarding the date on which North Dakota's action accrued. The Court did not reach the issue of the navigability vel non of the Little Missouri River. Block v. North Dakota, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).
 
 
 3
 On remand, the district court took additional evidence and held that the QTA's statute of limitations barred North Dakota's suit only with respect to those specific tracts as to which North Dakota was found to have had actual or constructive notice of the United States' claims. The United States appeals, contending that the QTA bars North Dakota's suit with respect to all portions of the riverbed.
 
 
 4
 The factual background was adequately set forth in our first decision. 671 F.2d at 271-72. In summary, the United States claims the riverbed by virtue of its status as a riparian landowner. North Dakota claims the riverbed under the equal footing doctrine and the Submerged Lands Act of 1953, which provide that the states are the presumptive title owners of all the submerged lands that underlie waters determined navigable at the time of statehood. See United States v. Louisiana, --- U.S. ----, 105 S.Ct. 1074, 1076, 84 L.Ed.2d 73 (1985); Montana v. United States, 450 U.S. 544, 551-52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981); Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 374-75, 97 S.Ct. 582, 588-89, 50 L.Ed.2d 550 (1977).
 
 
 5
 The QTA makes the United States amenable to suit in any action "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. Sec. 2409a(a). The QTA further provides, however, that:
 
 
 6
 Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.
 
 
 7
 28 U.S.C. Sec. 2409a(f). This statute of limitations is jurisdictional. "If North Dakota's suit is barred by Sec. 2409a(f), the courts below had no jurisdiction to inquire into the merits." Block v. North Dakota, 461 U.S. at 292, 103 S.Ct. at 1823. North Dakota's action is thus barred if it "knew or should have known of the claim of the United States" prior to October 31, 1966.
 
 
 8
 The district court approached the notice issue on a "tract-by-tract" basis, holding that notice of the United States' claim to several tracts of the riverbed was not tantamount to notice of the United States' claim to all of the riverbed with respect to which it was a riparian owner.
 
 
 9
 The trial court made the following findings with respect to the assertion by the United States of its claims to title to portions of the riverbed: In March 1955, an official of the Bureau of Land Management (BLM) wrote to the North Dakota Attorney General, inquiring "whether or not the Little Missouri River was navigable or non-navigable at the time of the admission of the State of North Dakota to the Union." An assistant attorney general responded to this inquiry by stating that he had been informed by the State Land Commissioner and the Water Conservation Commission that the river "is not now and has not been considered navigable."
 
 
 10
 The Bank of North Dakota (Bank) began issuing mineral leases on riverbed tracts in 1955.[1] The district court found that the Bank was not one of the agencies consulted by the assistant attorney general who had responded to the inquiry from the BLM.
 
 
 11
 In June of 1955, the BLM began issuing mineral leases with respect to certain portions of the riverbed. The earliest recorded BLM lease was filed for record on June 9, 1958. On June 7, 1962, the Bowman County Pioneer printed a public notice that the BLM was accepting bids for oil and gas leases on certain North Dakota lands, including five specific segments of the riverbed. From 1963 to 1965, the BLM recorded various documents relating to mineral leases on nine separate tracts of the riverbed.
 
 
 12
 On May 1, 1964, the manager of the Bank executed a communitization agreement on behalf of the Bank that recognized that both the United States and North Dakota claimed ownership of a certain described portion of the riverbed.
 
 
 13
 On January 27, 1966, an attorney for Shell Oil Company, which held certain mineral leases executed by the Bank, informed the Bank and the State Board of University and School Lands by letter that the United States was claiming to own sections of the riverbed that were covered by Shell's leases.
 
 
 14
 In 1963 and again in early 1966, the North Dakota Industrial Commission issued spacing orders for certain lands, including land lying within the riverbed. Certain of the exhibits introduced in the proceedings before the Commission show federal ownership of riparian lands and federal claims to the riverbed. The copies of these spacing orders that appear in the record bear the typed names, but not the signatures, of the then Governor, Attorney General, and Commissioner of Agriculture and Labor of the State of North Dakota.
 
 
 15
 From the foregoing factual record, the court concluded that "it is clear some state employees had some notice that a contest was developing between North Dakota and United States as to who claimed what portions of the river and on what basis."
 
 
 16
 The district court held that with respect to the present controversy the "circumstances" contemplated by the North Dakota constructive notice statute[2] consisted of the "execution, disclosure, occasional filings, and publication of potential bid lettings, of oil and gas lands, and correspondence relating to those lands in each case specifically described by government survey." The court held that the North Dakota recording statutes had no application with respect to the beds of navigable bodies of water held by the state inasmuch as the North Dakota Marketable Record Title Act, N.D.Cent.Code Sec. 47-19.1-11, specifically excludes from its operation the state of North Dakota. In view of this exclusion and in the light of the rule that the recordation of instruments affecting title to real property is constructive notice only to purchasers and encumbrancers subsequent to such recording, Hanson v. Zoller, 187 N.W.2d 47 (N.D.1971); First National Bank of Dickinson v. Big Bend Land Co., 38 N.D. 33, 164 N.W. 322 (1917), the court found that North Dakota was not put on constructive notice by the recording of the BLM documents relating to mineral leases on nine separate tracts of the riverbed.
 
 
 17
 The court further held that the public notice soliciting bids for oil and gas leases that was published in the June 7, 1962, issue of the Bowman County Pioneer did not constitute constructive notice to the state.
 
 
 18
 The court held that BLM's actions regarding the riverbed tracts were based on the premise that the Little Missouri River was not navigable and that therefore the United States had ownership interests in those tracts pursuant to N.D.Cent.Code Sec. 47-01-15, which provides: "In all cases where the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both." The court concluded, however, that the leases and notices regarding the tracts in which the United States asserted an ownership interest could not be interpreted to represent a claim by the United States to those portions of the riverbed that were not riparian to the lands specifically described in the leases and notices.
 
 
 19
 The court held that the communitization agreement signed by the Bank and the letter from counsel for Shell Oil Company to the Bank were sufficient to put the Bank, as agent for North Dakota, on notice of the claims of the United States with respect to those tracts described in the letter and the communitization agreement. Likewise, the court held that the spacing orders issued by the North Dakota Industrial Commission in 1963 and 1966 put the Bank on notice regarding the claims of the United States with respect to the acts specifically described in those orders. The court held that the fact of leasing activity by the BLM in 1959 did not give rise to actual or constructive notice to the Bank or to North Dakota. Likewise, the court held that the recording of the BLM leases in 1978 and during the period from 1963 to 1965 did not give rise to actual or constructive notice to the Bank or to North Dakota.
 
 
 20
 Based upon the foregoing findings and conclusions, the district court entered judgment dismissing North Dakota's complaint only as to those specific tracts with respect to which North Dakota had been given actual or constructive notice of the claim of the United States thereto. With a minor exception not material to this action, and with the exception of the tracts described in the portions of the complaint dismissed as time barred, the judgment quieted title to the riverbed in North Dakota. The judgment also reinstated that portion of the original judgment which declared the Little Missouri River to be navigable.
 
 DISCUSSION
 
 21
 Federal law governs the interpretation of the QTA, although state law may be invoked in the application of statutory language to specific facts. Amoco Production Co. v. United States, 619 F.2d 1383, 1387 (10th Cir.1980). Although state law has traditionally been applied in resolving questions involving federal claims to real estate, id., constructive notice may be imputed under the QTA where such notice would not be imputed by state statute. D.C. Transit System, Inc. v. United States, 717 F.2d 1438 (D.C.Cir.1983).
 
 
 22
 Whether North Dakota knew or should have known of the United States' claim is a mixed question of fact and law. Poverty Flats Land & Cattle Co. v. United States, 706 F.2d 1078 (10th Cir.1983); Kinscherff v. United States, 586 F.2d 159 (10th Cir.1978).
 
 
 23
 The parties agree, as do we, that the words "should have known" in Sec. 2409a(f) are subject to a test of reasonableness. See California v. Yuba Goldfields, Inc., 752 F.2d 393 (9th Cir.1985); D.C. Transit System, Inc. v. United States, 717 F.2d at 1441; Deakyne v. Dep't Army Corps of Engineers, 701 F.2d 271 (3rd Cir.1983); Knapp v. United States, 636 F.2d 279 (10th Cir.1980); Amoco Production Co. v. United States, 619 F.2d at 1387-88. The United States argues that it is illogical to require proof of notice with respect to each tract of the riverbed in which it claims an interest inasmuch as its claim is based on the premise that the entire river is non-navigable. In the light of the QTA's test of reasonableness, we find this argument to be persuasive.
 
 
 24
 We conclude that the facts as found by the district court lead ineluctably to the conclusion that North Dakota was put on notice of the United States' claim of ownership interest in all of the riverbed of the Little Missouri River with respect to which it was a riparian owner. Indeed, one would be hard put to say that by itself the inquiry to the North Dakota Attorney General from the Bureau of Land Management in March of 1955 concerning the navigability of the Little Missouri River was not sufficient to put the state on notice that the United States intended to assert ownership over the riverbed. That aside, however, the execution by the Bank of the communitization agreement, the letter from counsel for Shell Oil Company to the Bank and to the State Board of University and School Lands (and here we note that the attorney general of North Dakota is a member of the State Board, N.D.Cent.Code Sec. 15-01-01), and the spacing orders issued by the North Dakota Industrial Commission in 1963 and in 1966, all of which recognized the United States' claims to mineral interests in at least portions of the riverbed, constituted notice to the state within the meaning of Sec. 2409a(f).
 
 
 25
 North Dakota contends that those incidents were of no significance and that the district court stretched the reasonableness test of the QTA to the limit in finding actual notice with respect to the specific tracts involved in those incidents. We conclude, however, that the district court's refusal to extend the scope of the actual notice of the United States' claim to the specific tracts to constitute notice regarding its claim to all of its riparian riverbed interests constituted too narrow a view of the reach of Sec. 2409a(f). There is nothing in the language or legislative history of the QTA's statute of limitation that requires a clear and unambiguous claim.
 
 
 26
 The test for accrual under section 2409a(f) is when "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. Sec. 2409a(f). Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.
 
 
 27
 Knapp v. United States, 636 F.2d at 283.
 
 
 28
 In California v. Yuba Goldfields, Inc., supra, the Court of Appeals for the Ninth Circuit held that California's suit to quiet title to a portion of the Yuba River was barred due to actual notice of the United States' claim since the early 1900's, when California entered a cooperative agreement and signed a deed which acknowledged the United States' claim. Id. at 396. In rejecting California's argument that the United States' claim must be clear and unambiguous, the court looked to the language of Sec. 2409a(f) and found no such requirement therein. Id. at 397. Furthermore, the court held, "[t]he mere fact that the project was undertaken with California's cooperation does not lead to the conclusion that California was unaware of the federal interest in the property." Id. Likewise here, the communitization agreements signed by the Bank of North Dakota were also cooperative in nature and acknowledged the United States' claim.
 
 
 29
 Our conclusion is bolstered by the fact that because the QTA constitutes a waiver of the sovereign immunity of the United States, the conditions contained therein must be strictly observed and the time-bar provisions not interpreted "in a manner that would 'extend the waiver beyond that which Congress intended.' " United States v. Block, 461 U.S. at 287, 103 S.Ct. at 1820 (quoting United States v. Kubrick, 444 U.S. 111, 117-18, 100 S.Ct. 352, 356-57, 62 L.Ed.2d 259 (1979). See also California v. Yuba Goldfields, 752 F.2d at 396; Fulcher v. United States, 696 F.2d 1073, 1076 (4th Cir.1982); Knapp v. United States, 636 F.2d at 282.
 
 
 30
 Given the unmistakably specific actual notice that North Dakota received concerning the tracts described in the communitization agreement, the letter from counsel for Shell Oil Company, and the Industrial Commission's spacing orders, this is not a case where the doctrine of constructive notice creates a fiction or operates harshly. Cf. Amoco Production Co., 619 F.2d at 1388. Indeed, in the face of the actual notice it received, it would blink reality to say that the state should be able to profess ignorance of the United States' claims to other portions of the riverbed.
 
 
 31
 Finally, we believe that the decision in Park County v. United States, 626 F.2d 718 (10th Cir.1980), is persuasive authority for rejecting the tract-by-tract approach utilized by the district court in the present case. There, the plaintiff counties argued that the sign and rock barrier placed by the U.S. Forest Service on a right-of-way, alerting the public to the fact that they were entering into a national forest area from which motor vehicles were prohibited, constituted notice only as to the portion of the right-of-way behind the sign and barrier. The court rejected this argument, holding that the counties had been put on notice that the United States claimed control over at least a substantial portion of the right-of-way and that they were thus put on constructive notice to make reasonable inquiry regarding the remainder of the purported right-of-way inasmuch as the remainder would have little or no remaining utility if severed. 626 F.2d at 721 n. 6. Although in the present case the claim of the United States to the specific tracts would not have rendered the remainder of the riverbed inutile, the state has advanced no logical argument why the United States would lay claim to some of its riparian riverbed rights and not to the remainder thereof. We conclude, therefore, that the assertion by the United States of its claim to the specific tracts put the state on constructive notice of the United States' claim to the remainder of the riverbed tracts. Thus the district court should have held that North Dakota's claim was barred in its entirety.
 
 
 32
 North Dakota contends that the trial court's holding on the issue of navigability, affirmed by this court in the first appeal, is the law of the case inasmuch as the United States did not petition for certiorari on that issue. Block v. North Dakota, 461 U.S. at 292 n. 29, 103 S.Ct. at 1822 n. 29. In view of our holding that the trial court was without jurisdiction to inquire into the merits of North Dakota's complaint, however, we need not belabor this point. Entered in the absence of jurisdiction, the entire judgment must be reversed.
 
 
 33
 The parties agree that a decision in favor of the United States on the statute of limitations issue will not resolve the underlying dispute regarding the United States' claim to the riverbed. As the Supreme Court stated,
 
 
 34
 A dismissal pursuant to Sec. 2409a(f) does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits.
 
 
 35
 Block v. North Dakota, 461 U.S. at 291-92, 103 S.Ct. at 1822 (footnotes omitted).
 
 
 36
 Our decision may require North Dakota to adopt a different line of attack, but that prospect can hardly deter us from entering the judgment required by the facts before us.
 
 
 37
 The judgment is reversed and the case is remanded to the district court with directions to dismiss the complaint.
 
 
 
 [1]
 During the period from 1957 to 1977, the Bank had specific legislative authority to enter into leases covering the beds of navigable waters
 
 
 [2]
 North Dakota Century Code Sec. 1-01-25 defines constructive notice as:
 Every person who has actual knowledge of circumstances sufficient to put a prudent man upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence is deemed to have constructive notice of the fact itself.