# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1819

_____

|  |  |  |
|---|---|---|
| Spirit Lake Tribe, formerly known as Devils Lake Sioux Tribe, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| State of North Dakota, Garrison | * | |
| Diversion Conservancy District, | * | Appeal from the United States |
| United States of America, 101 Ranch, | * | District Court for the |
| a North Dakota Partnership, | * | District of North Dakota |
| Ruth Ward, Ralph Ward, | * | |
| Steve A. Ward, Imogene Christensen, | * | [TO BE PUBLISHED] |
| Claire Engelhardt, Carlyle Brye, | * | |
| Arnold Yri, Vernyll Yri, | * | |
| Reginal Herman, Eileen Herman, | * | |
| Clifford M. Johnson, Melvin Diehl, | * | |
| Dustin King, Estate of Mabel Solheim, | * | |
| Estate of Minnie Johnston, Francis P. | * | |
| Schneider, Gloria Schneider, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: May 24, 2001

Filed: August 17, 2001

_____

Before BYE, BRIGHT, and MAGILL, Circuit Judges.

_____

BYE, Circuit Judge.

Devils Lake is a large, freshwater lake in northeastern North Dakota. The lake has no natural outlets, so its water level and size fluctuate considerably in response to changing climatic conditions. In the recent past, increased rainfall has slowly raised the water level and expanded the shores of the lake. The incremental expansion has swallowed whole towns, farms, and roads producing breathtaking results. The significant hydrological phenomenon at Devils Lake forms the backdrop for an equally momentous legal event—a long-simmering dispute concerning ownership of the lake itself.

The Spirit Lake Tribe resides on land that abuts the lake. The Tribe contends that an 1867 treaty gave it title to the lakebed, to be held in trust by the federal government. The Tribe filed the present lawsuit in 1986 seeking to declare its rights to the lake, to enjoin multiple defendants from using the lake, and to recover damages for various wrongful uses of the lake. The district court granted summary judgment in favor of all defendants, and the Tribe instituted the present appeal. We affirm the judgment of the district court with one exception. We vacate the portion of the summary judgment pertaining to the federal government, and remand the action to the district court to dismiss the government for lack of subject matter jurisdiction.

I

We recounted the factual underpinnings of this action in an earlier appeal. Devils Lake Sioux Tribe v. State of N.D., 917 F.2d 1049, 1050-51 (8th Cir. 1990) (Devils Lake II). A brief overview of the facts at this juncture will serve to frame our discussion.

In an 1867 treaty, ancestors of the modern-day Tribe received vast lands in the Dakotas and Minnesota as a reward for their loyalty to the government during the Sioux

Uprising of 1862. Article IV of that treaty established the Fort Totten Reservation for the use of the Tribe.

Article IV described the northern boundary of the Reservation as follows: "Beginning at the most easterly point of Devil's Lake; thence along the waters of said Lake to the most westerly point of the same . . . ." The phrase "thence along the waters" has been interpreted by various parties (at various points in time) to refer to the northern shore of the lake, the southern shore of the lake, and even a variety of lines drawn across the middle of Devils Lake. The proper interpretation is critical. For example, if the boundary is the northern shore, then the Reservation includes Devils Lake. Conversely, if the southern shore forms the boundary, then the lake lies outside the Reservation. See Devils Lake II, 917 F.2d at 1051.

On June 9, 1986, the Tribe filed this action to quiet title to Devils Lake. The Tribe named the federal government, the State of North Dakota, the Garrison Division Conservancy District (an arm of the State), and numerous private landowners as defendants. The Tribe contends that the 1867 treaty established the northern shore of Devils Lake as the northern boundary of its reservation, and that the government has held title to Devils Lake in trust for the Tribe for more than a century. At worst, the Tribe argues, the 1867 treaty is ambiguous. The Tribe points out that courts traditionally resolve ambiguities in treaties in favor of Indian tribes. Under either approach, the Tribe asserts entitlement to Devils Lake.

The federal government disputes the Tribe's claim to the lake. The government claims that Devils Lake was not included in the 1867 treaty that formed the reservation. The government asserts that it continued to hold title to Devils Lake until 1889, when it conveyed the lake to the State of North Dakota at its statehood under the "equal footing" doctrine. See Shively v. Bowlby, 152 U.S. 1, 49-50 (1894) (explaining that the government cedes navigable waterways to States when they join the Union). According to the government, the State held complete title to Devils Lake until 1971.

In 1971, the State quitclaimed title to a portion of the lake to the government to permit construction of a massive public works project called the Garrison Diversion Unit.

In 1989, the district court granted the federal government's motion for summary judgment. Devils Lake Sioux Tribe v. State of N.D., 714 F. Supp. 1019 (D.N.D. 1989) (Devils Lake I). The district court held that the Tribe had already resolved its claim to Devils Lake as part of a 1977 Indian Claims Commission (ICC) settlement. Id. at 1022-26. The Tribe appealed, and we reversed the district court's decision. Devils Lake II, 917 F.2d at 1056-57. We discerned factual disputes regarding the precise issues resolved in the 1977 ICC proceeding, and held that "[t]he record does not support a summary judgment on a theory that the 1977 settlement disposes of the Tribe's alleged rights. . . . [T]his issue requires further development on the merits." Id. at 1056.

The parties returned to the district court. They spent several years attempting to settle the case, but settlement talks failed to bear fruit. In 1998, the parties revived their case before the district court. After revival, court and counsel agreed to bifurcate proceedings. In the first phase, the federal government and the State would raise preliminary procedural and jurisdictional defenses. If the Tribe prevailed, the parties would then try the case on the merits and resolve the question of ownership.

The district court entertained the defendants' motions for summary judgment on the phase-one preliminary questions and heard extended argument. On January 24, 2000, the court issued a 17-page opinion granting summary judgment. The court held that the Tribe's suit against the federal government was time-barred. In addition, the court held that "issue preclusion"[1] prevented the Tribe from litigating the ownership of

---

[1]It appears that the district court intended *claim* preclusion to serve as the basis for its conclusion. See New Hampshire v. Maine, 121 S. Ct. 1808, 1814 (2001) (distinguishing claim preclusion and issue preclusion).

Devils Lake because the Tribe could have raised that issue (but did not) in a 1951 ICC suit. After dismissing the federal government, the court determined that the government was an indispensable party to the proceedings, and that the Tribe's suit against the State and the other defendants could not continue absent the government. See Fed. R. Civ. P. 19(b). Accordingly, the court entered a final judgment adverse to the Tribe.

II

The Quiet Title Act of 1972 (QTA), Pub. L. No. 92-562, 86 Stat. 1176, authorizes lawsuits against the federal government "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983) (Block I). The Supreme Court has held that the QTA provides the only basis for an Indian plaintiff's quiet title action against the federal government. United States v. Mottaz, 476 U.S. 834, 841-44 (1986).

The Tribe's suit against the federal government relies upon the QTA. We conclude, however, that QTA relief is not available because the Tribe failed to comply with the pertinent statute of limitations.

A

The QTA contains a generous 12-year statute of limitations, which provides that an "action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). Because the QTA waives the government's sovereign immunity from suit, Block I, 461 U.S. at 280, a plaintiff must comply with the limitations period to effectuate that waiver. Hence the QTA statute of limitations acts as a jurisdictional bar

-5-

unlike most statutes of limitations, which are affirmative defenses.  See State of N.D. ex rel. Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1310 (8th Cir. 1986) (Block II).

The 12-year limitations period begins when a plaintiff knows or should  know of the government's adverse land claim.  28 U.S.C. § 2409a(g).  This standard does not require the government to provide explicit notice of its claim.  The government's claim need not be "clear and unambiguous."  Block II, 789 F.2d at 1313.  "Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Id. (quoting Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980)).

Further, the government's interest "need not amount to full legal title . . . . As long as the interest claimed is a 'cloud on title,' or a reasonable claim with a substantial basis, it constitutes a 'claim' for purposes of triggering the twelve-year statute of limitations."  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir. 1991).  Even invalid government claims trigger the QTA limitations period.  See id.  Simply put, the limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land.  See Patterson v. Buffalo Nat'l River, 76 F.3d 221, 224 (8th Cir. 1996).

B

The government argues that the Tribe "knew or should have known" of its claim to Devils Lake by at least July 7, 1971.[2]  On that date, the federal government acquired more than 62,000 acres of the lake from the State.  The State deeded this sizeable chunk of Devils Lake to the government via quitclaim deed to assist the government in

---

[2]The government also contends that a series of late 19th and early 20th century events notified the Tribe of its claim.  We need not address that contention.

building the Garrison Diversion Project. The Project was managed by the federal Bureau of Reclamation, and was designed to divert water from the Missouri River to irrigate arid lands, and stock municipal water supplies, in central and eastern North Dakota.

The government's 1971 land acquisition was widely reported by local media outlets, such as the *Devils Lake Journal* and the *Benton County Farmers Press*, and by larger organizations as well. The Tribe apparently knew of the government's land acquisition because a 1970 tribal resolution expressed concern about land ownership in view of "the coming Garrison Diversion Project." State App. 23-24. The Project itself was the single most important, visible public works project in North Dakota in the last half of the 20th century. The Tribe could hardly have turned a blind eye to its major details. See generally In re Garrison Diversion Conservancy Dist., 144 N.W.2d 82, 88 (N.D. 1966) (describing newspaper coverage of public hearings held in major cities in eastern North Dakota to discuss the contract and deed between the State and the government). Thus we have little doubt that the Tribe was aware of the Garrison Diversion Project generally, and the government's acquisition of a portion of the lake specifically.

Even if the Tribe did not actually know that the government acquired title to a portion of the lake in 1971, the Tribe certainly *should* have known. As a matter of law, a quitclaim deed disgorging title to the United States places a landowner on notice and triggers the QTA statute of limitations. State of Cal. ex rel. State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393, 397 (9th Cir. 1985). The quitclaim deed, coupled with evidence that the Tribe likely knew about the extent of the Garrison Diversion Project, convinces us that, in 1971, the Tribe "knew or should have known," 28 U.S.C. § 2409a(g), that the government claimed Devils Lake.

Because the Tribe learned of the federal government's claim to Devils Lake in 1971, the Tribe was required to file a QTA suit by 1983 to preserve the government's

waiver of sovereign immunity. The Tribe actually filed its complaint in this action in June 1986, so the action is ostensibly barred by the 12-year statute of limitations.

C

In an effort to forestall the operation of the statute of limitations, the Tribe raises three counter-arguments. We discuss each in turn.

1

Assuming that its QTA claim accrued in 1971, the Tribe contends that the government abandoned its claim to Devils Lake in 1976. The Tribe believes that the government later reversed course in 1981, when it reasserted its prior interest in the lake. The Tribe says that the government's 1981 claim was a new claim, which set in motion a new QTA statute of limitations. Thus the Tribe argues that its 1986 lawsuit is timely because the operative 12-year clock began in 1981.

We have little disagreement with the Tribe's presentation of the governing legal framework. Like any private citizen or corporate entity, the government may abandon its interest in land. If the government clearly and unequivocally abandons its interest, a district court loses jurisdiction over a pending QTA action. See 28 U.S.C. § 2409a(e). We believe that the principle espoused in § 2409a(e) applies, by analogy, to situations in which a plaintiff has not yet filed a QTA suit (though the limitations period has been triggered by adverse government conduct). In those situations, the government's outright abandonment effectively removes the cloud on a plaintiff's title and extinguishes his obligation to file a quiet title action within 12 years. If the government later reasserts an adverse claim, the reasserted claim is properly regarded as a new claim and a new 12-year period begins in which a plaintiff may file his QTA action against the government. See Michel v. United States, 65 F.3d 130, 132-33 (9th Cir. 1995) (per curiam).

-8-

Applying these principles to the present case, the Tribe argues that a 1976 memorandum authored by Reid Peyton Chambers abandoned the government's interest in Devils Lake. Chambers served as the Associate Solicitor for the Division of Indian Affairs within the Department of the Interior in 1976. The Tribe's argument requires us to review the circumstances that gave rise to Chambers's memo in considerable detail.

As we have explained, see *supra* at 3, the State believes it acquired title to Devils Lake at statehood, in 1889, under the equal footing doctrine. At some point in the mid-1970s, the North Dakota Attorney General sought to establish the exact amount of territory in Devils Lake that the State had acquired in 1889. The North Dakota Attorney General requested an opinion on the matter from the Interior Department.

The North Dakota Attorney General's request was assigned to the Office of the Solicitor. The Solicitor's Office was (and still is) comprised of several divisions. Each division bore responsibility for varying aspects of the Department's broad mandate over domestic matters. Cf. Federal Indian Law 263 (U.S. Gov't Printing Office 1972). The Solicitor apparently directed the North Dakota Attorney General's request to a deputy in charge of one of the divisions—the Associate Solicitor for the Division of Energy & Resources.

The Associate Solicitor for the Division of Energy & Resources recognized that the North Dakota Attorney General's request implicated significant questions of tribal land ownership. Accordingly, he asked for assistance from his counterpart, Chambers, who then served as the Associate Solicitor for the Division of Indian Affairs. On June 21, 1976, Chambers responded. He addressed a reply memorandum to the Associate Solicitor for the Division of Energy & Resources in which he concluded that the State did not acquire Devils Lake in 1889 under the equal footing doctrine. Chambers wrote, "I am of the opinion that Devils Lake is . . . wholly within [the Reservation's]

boundaries and the United States holds title to the lakebed in trust for the Devils Lake Sioux Tribe." Tribe App. 74.

The Tribe argues that Chambers's view represented the position of the government in 1976. To prove the point, the Tribe cites a 1981 memorandum from the Solicitor of the Interior Department repudiating Chambers's conclusion. The 1981 memo advises the Assistant Attorney General of the United States that Chambers's memo "should no longer be relied upon as stating the position of [the Interior Department] on the ownership of the lakebed." Tribe App. 222. In sum, the Tribe posits that Chambers's memo abandoned the government's claim to Devils Lake.

The Tribe's argument suffers from six distinct flaws.

a

"In the first place, the Government cannot abandon property without congressional authorization." Warren v. United States, 234 F.3d 1331, 1338 (D.C. Cir. 2000) (rejecting a plaintiff's QTA claim as time-barred) (citing Supreme Court decisions). The Property Clause of the Constitution invests Congress with plenary power to dispose of real property belonging to the United States. See U.S. Const. art. IV, § 3, cl. 2. "Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." Royal Indemnity Co. v. United States, 313 U.S. 289, 294-95 (1941) (citations omitted).

It is undisputed that Congress never abandoned the government's 1971 claim to Devils Lake. Likewise, Associate Solicitor Chambers was a "subordinate officer," who lacked Congressional authorization to abandon a government land claim. See Op. Sol. M-35028, 60 I.D. 142, 147 (Mar. 4, 1948) (concluding that the Associate Solicitor for the Division of Indian Affairs "is not an 'Officer of the United States' in the

-10-

Constitutional sense (Art. II, Sec. 2, Cl. 2), because he is not appointed through the procedure of nomination by the President and confirmation by the Senate.").

Our review of Interior Department policy confirms that Chambers lacked the authority to bind the government. In 1976, the governing regulations of the Solicitor's Office strictly forbade Associate Solicitors from signing documents involving "legal opinions of major importance." Solicitor's Regulation 1 § 1(a) (reproduced in Aff. of Terrance C. Wiles, Feb. 12, 1988, Ex. G). Section 1(b) excluded Associate Solicitors from conveying the government's position "respecting legal questions" to persons outside the Department of Interior without first receiving approval from either the Solicitor or the Deputy Solicitor. Id. In addition, § 2(b)(2) of that same Regulation required an Associate Solicitor to obtain the concurrence of another Associate Solicitor when the matter in issue concerned two Divisions. See id.

These three regulations manifest Chambers's inability to declare unilaterally that his 1976 view was the position of the government. On a question of significant legal importance, such as the ownership of Devils Lake, Chambers had no authority to sign off. In communications with persons outside the Department involving the government's position, Chambers needed the approval of the Solicitor or the Deputy Solicitor. Nothing in the record demonstrates that the Solicitor or Deputy Solicitor ever approved Chambers's conclusions or conveyed them to persons outside the Interior Department. Finally, Section 2(b)(2) applied to Chambers's memo because it was addressed to the Associate Solicitor for the Division of Energy & Resources, the official who initially requested Chambers's assistance. Chambers would have had to coordinate his views with those of the Associate Solicitor for the Division of Energy & Resources.

The Tribe was almost surely aware of the limitations on Chambers's authority. Chambers left his government post and formed his own law firm at the close of the Ford Administration. Remarkably, as a private attorney, Chambers discussed his 1976

memo with representatives of the Tribe in Washington in February 1978. <u>See</u> Aff. of Carl McKay ¶ 5 (Dec. 9, 1986) (McKay served as Chairman of the Tribe from 1976 to 1980). At the 1978 meeting, Chambers was accompanied by his law partner, Marvin Sonosky. The two met with Tribal officials to discuss the meaning of the 1976 memo less than two years after Chambers authored that memo.[3] Because Chambers is an accomplished attorney, we are confident that he understood the policies under which he operated while working in the Solicitor's office, and that he would have conveyed the extent of his limited authority to Tribal leaders. Of primary importance, the Tribe would have learned these facts well within the QTA's 12-year statute of limitations.

These points present insurmountable hurdles to the Tribe's argument that Chambers abandoned the government's ownership of Devils Lake in 1976.

b

Even if we assume for the sake of the Tribe's argument that Chambers possessed the authority to bind the government, Chambers's memo cannot be interpreted as an exercise of that authority. Chambers did not act in a manner that suggested he was establishing a position for the government, and thus we cannot accept the Tribe's conclusion that Chambers abandoned the government's claim to Devils Lake in these circumstances.

In the main, federal agencies bind the government in two ways. Agencies promulgate rules, subject to the notice-and-comment provisions of the Administrative Procedure Act. Agencies also adjudicate individual controversies, usually taking testimony and receiving evidence in the fashion of our courts. The Tribe has not

---

[3]The Tribe retained Chambers's law firm, and the firm eventually filed the 1986 complaint. The firm continued to represent the Tribe in this action until the late 1990s.

-12-

attempted to argue that Chambers's memo was tantamount to agency rule-making or adjudication, nor could it reasonably maintain that position.

Aside from making rules and adjudicating cases, federal agencies also issue an array of informal advice in opinion letters, manuals, enforcement guidelines, and so forth. Unlike rules and adjudications, however, these informal agency pronouncements "lack the force of law." Christensen v. Harris County, 529 U.S. 576, 587 (2000). Thus, even if Chambers's memo were likened to an opinion letter, the memo would not be law. In other words, the 1976 memo did not bind the government, nor establish the government's position, as to the ownership of Devils Lake.

Even if these types of *informal* agency pronouncements had legal force, the foregoing comparison between Chambers's memo and an informal opinion letter fails. The Office of the Solicitor (within the Interior Department) regularly issues opinion letters that are routinely published in the Federal Register. Chambers's memo bears no resemblance to such an opinion letter. Chambers's memo has not been published; indeed, his 1976 memo was never formally issued to the parties whose land rights are affected by its conclusions. Viewed on its own terms, Chambers's memo does not purport to establish a position binding the government. Chambers phrased his conclusion that the Tribe owned the lake as if it were his personal opinion, not the government's position. Had Chambers intended to expound the position of the government, he would likely have said so, rather than phrasing his conclusions in the fashion of a personal opinion. These factors strongly suggest that Chambers's memo is undeserving of consideration as informal agency action.[4]

---

[4]We have cause to doubt that Chambers was well informed about the Devils Lake ownership controversy. It is remarkable that his memo—written just five years after the government purported to acquire a portion of the lake from the State—fails to mention, or even recognize the existence of, the 1971 quitclaim deed.

Because Chambers's memo was neither formal nor informal agency action (in the senses we have described above), we conclude that Chambers's memo could not have established the government's position in 1976. Our conclusion comports with common sense: intra-office memoranda do not bind the government. Cf. Aulston v. United States, 915 F.2d 584, 595 & n.16 (10th Cir. 1990) (disregarding internal memoranda in determining the position of the Interior Department). Chambers's 1976 memo quite simply lacked the legal force necessary to abandon the federal government's prior claim to Devils Lake. Cf., e.g., Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1320-21 & n.2 (D.C. Cir. 1998) ("the views of FDA staff do not bind the agency's final decisionmaker").

c

Irrespective of Chambers's authority to make government policy, the government never adopted Chambers's views. The record in the present case does not reveal what use, if any, the Associate Solicitor for the Division of Energy & Resources made of Chambers's memo. Nor does the record disclose whether the Associate Solicitor for the Division of Energy & Resources even agreed with Chambers's views, or forwarded Chambers's conclusions to superiors in the Interior Department, or to the North Dakota Attorney General. The government never formally transmitted Chambers's memo to the Tribe, though the Tribe later obtained a copy through other channels. In short, the evidence in this case suggests that the government never took an affirmative act consistent with the conclusions in Chambers's memo.

Just as the dog's failure to bark revealed to Sherlock Holmes that there had never been a midnight intruder, see Arthur Conan Doyle, *The Adventure of Silver Blaze*, The Strand Magazine, December 1892, at 656-57, the government's failure to act emasculates the Tribe's argument that Chambers's memo had legal force. At oral argument, counsel for the government explained that the government would have notified the State of its change in legal position if it had agreed with Chambers's

conclusions.  As part of their agreement, the State and the government adopted an accounting procedure by which to compensate the government in the event the Tribe was later deemed to own the lake.  Under the terms of that procedure, the government would be entitled to seek compensation from the State for "losing" the portion of Devils Lake it believed it had acquired in 1971.  See Supp. Agreement Between The United States and the Garrison Diversion Conservancy Dist., attached as exhibit to Decl. of Darrell Krull (Oct. 20, 1986); cf. Devils Lake II, 917 F.2d at 1052 n.5.  It is undisputed that the government never sought compensation from the State.  We find it highly implausible that the government would not have remedied its "loss" of Devils Lake under the terms of its express agreement with the State.  We therefore conclude, like Holmes, that the government never changed its position, and never viewed Chambers's memo as abandoning its rights to Devils Lake.

d

The Tribe also raises the specter of the law-of-the-case doctrine, whose application we reject.

The Tribe contends that we have already determined that Chambers's memo represented the government's position.  In the first appeal of this action, in 1990, we asserted without explanation that Chambers's memo was an "opinion" that represented the views of the Department of the Interior.  Devils Lake II, 917 F.2d at 1052-53.  Our assertion in the 1990 opinion was, however, immaterial to the resolution of the only issue presented in that appeal, which addressed the claim-preclusive effect of a 1977 ICC settlement.  We are not obliged to accept our previous asseverations because the law-of-the-case doctrine does not extend to a prior opinion's recitation of facts not material to the disposition of that appeal.  See Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 462-63 (1st Cir. 1992).

e

The Tribe also seeks to establish the government's abandonment of Devils Lake in 1976 by reference to a 1981 memo. In 1981, the Solicitor's Office of the Department of the Interior informed the Justice Department that "the June 21, 1976 memorandum of the Associate Solicitor, Indian Affairs, should no longer be relied upon as stating the position of this Department on the ownership of the lakebed." Tribe App. 222. The Tribe ventures that the author's use of the words "no longer" proves that, between 1976 and 1981, Chambers's memo had in fact been relied upon to state the government's position vis-a-vis Devils Lake.[5] We disagree.

As we have explained in considerable detail above, Chambers's memo *did not* abandon the government's interest in Devils Lake. The Tribe is therefore left to argue that, in repudiating the 1976 memo, the 1981 memo retroactively revived the force of the 1976 memo. The Tribe says that the Solicitor's 1981 memo somehow altered the past, though it had never been reasonable to rely on Chambers's memo in the first place. The argument is plainly specious. The only reasonable interpretation of the 1981 memo is that the Solicitor sought to avoid any misunderstanding that Chambers's memo might have created because it reached a wider audience than the Solicitor's Regulations authorized. See Solicitor's Regulation 1, *supra*, at 11.

As concerns the 1981 memo, the Tribe is not entitled to the benefit of every favorable inference because, strictly speaking, we are not reviewing the propriety of summary judgment. Our present inquiry is directed at the historical facts undergirding the exercise of the district court's *jurisdiction*, in particular, whether the Tribe filed its QTA action within the governing 12-year statute of limitations. As to that jurisdictional inquiry, "no presumptive truthfulness attaches to the plaintiff's allegations," Osborn v.

---

[5]The Tribe also relies on statements made by the government in the context of unrelated litigation in 1980 and 1981. These statements equivocate about ownership of the lake, and therefore cannot be interpreted to abandon the government's interest.

United States, 918 F.2d 724, 730 (8th Cir. 1990), and the Tribe, not the government, bears the burden of establishing the existence of subject matter jurisdiction, see id. We do not mean to suggest that we are presently engaged in fact-finding. The point is simply that we need not accept the force of the Tribe's less reasonable inference when a more reasonable explanation is readily available.

f

Even if we credited all the Tribe's arguments and inferences about the 1976 and 1981 memos, we could not conclude (as a legal matter) that the QTA statute of limitations stopped. As we explained above, the QTA limitations period begins to accrue when a plaintiff has reason to know of a cloud on his title. See Richmond, 945 F.2d at 769. The inescapable corollary to this principle is that the QTA limitations period does not stop when government action simply compounds a pre-existing cloud on title. Viewing the Tribe's position charitably, the 1976 and 1981 memos did no more than confirm the "1971 cloud" that already existed on the Tribe's putative title to Devils Lake.

We therefore conclude that the government did not abandon its interest in Devils Lake, nor concede the Tribe's ownership thereof, in Chambers's memorandum. The Tribe's reliance upon Chambers's memo as a reflection of change in the government's position was wholly unreasonable and legally untenable. As a consequence, the Tribe's 12-year QTA limitations period did not stop in 1976.

2

In its second counter-argument, the Tribe contends that the federal government has made different claims to different portions of Devils Lake at different points in time. The Tribe therefore urges us not to treat the lake as an indivisible whole, but rather to apply multiple 12-year statutes of limitations to the respective portions of

Devils Lake claimed at different times by the government.  We rejected this very argument in Block II, and we likewise reject it in this case as well.

In Block II, we repudiated a tract-by-tract analysis of a QTA statute of limitations issue.  We determined that when ownership of a disputed property would be resolved based on a single legal theory, notice of the government's claim to one tract constituted notice as to other tracts.  "[T]he assertion by the United States of its claim to the specific tracts put the state on constructive notice of the United States' claim to the remainder of the riverbed tracts."  Block II, 789 F.2d at 1314.  We expressed our view that "the district court's refusal to extend the scope of the actual notice of the United States' claim to the *specific tracts* to constitute notice regarding its claim to *all* of its riparian riverbed interests constituted too narrow a view of the reach of § 2409a[g]."  Id. at 1313 (emphasis added).

The Tribe's complaint avers that the government holds title to *all* of Devils Lake in trust for the Tribe: "This is an action brought by the Devils Lake Sioux Tribe . . . to establish that it is the beneficial owner of the bed of Devils Lake."  Complaint ¶ 1.  The parties dicker over the proper interpretation of a single sentence in an 1867 treaty.  But all sides agree that this case presents the question of ownership of Devils Lake, not ownership of discrete tracts of Devils Lake.  Because a single legal dispute animates this case, Block II disposes of the Tribe's multiple-tract argument.  Block II compels the conclusion that notice to the Tribe in 1971 that the government acquired a sizeable portion of Devils Lake via quitclaim deed constructively informed the Tribe of the government's adverse claim to the entire lake.  789 F.2d at 1313-14.  We reject out of hand the Tribe's feeble efforts to distinguish Block II.

3

Finally, the Tribe compares the present title dispute to private trust law.  The Tribe argues that it lacked notice of the government's *adverse* interest in Devils Lake

in 1971 because it presumed that the government, as trustee, was acting in its best interests. The Tribe relies heavily upon <u>Loudner v. United States</u>, in which we held that an Indian beneficiary's duty to discover claims against the government qua trustee was "somewhat lessened," or "diminished," because the beneficiary was entitled to rely upon the good faith and expertise of the government. 108 F.3d 896, 901 (8th Cir. 1997).

<u>Loudner</u> did not involve a QTA claim, and, in our view, <u>Loudner</u> does not apply to QTA suits. We must construe the QTA's waiver of sovereign immunity strictly. <u>See</u> <u>Block I</u>, 461 U.S. at 287. Obviously, the principle of strict construction applies with full force to the elements of § 2409a(g), timeliness and accrual. We believe that a strict construction of the QTA is largely at odds with <u>Loudner</u>'s rule that an Indian plaintiff has a reduced responsibility to discover adverse government conduct. Furthermore, we note that in <u>Mottaz</u>, a QTA action involving an Indian plaintiff, the Supreme Court made no mention of, or allusion to, the sort of reduced responsibility rule the Tribe advocates in the present case. 476 U.S. at 842-44. Because a strict reading of the QTA would not entitle the Tribe to benefit from <u>Loudner</u>'s guidance, we find <u>Loudner</u> to be an unreliable guide in this case.

D

We agree with the district court that the Tribe exceeded the QTA statute of limitations. We part company with the district court only so far as the form of relief is concerned. Facing a time-barred claim, the district court entered summary judgment in favor of the government. We believe that the court's entry of summary judgment was improper because the QTA statute of limitations has a jurisdictional flavor. Plainly put, a district court lacks power and authority to entertain a time-barred QTA suit. The district court in this instance ought to have dismissed the government for lack of jurisdiction, rather than entering judgment in the government's favor.

Though we agree with the district court as to the ultimate resolution of the Tribe's claims against the government, we are obliged to vacate its judgment in part, and to remand the matter so that the court may properly dismiss the claims against the government for lack of jurisdiction.

There is no small difference between a dismissal and a summary judgment in this context. Under the terms of the district court's final judgment, the Tribe's claim to the lake has been litigated and lost on the merits. The government would own Devils Lake. By instructing the district court to dismiss the Tribe's complaint for lack of jurisdiction, however, the ownership of Devils Lake remains an open question. "A dismissal pursuant to § 2409a[g] does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits." Block I, 461 U.S. at 291-92. The present controversy must await future legislative, or perhaps judicial, consideration.

III

We turn now to the Tribe's remaining claims against the State and various private parties who purport to own land along the shore of Devils Lake.

Unlike its claim against the federal government, the Tribe's remaining claims do not falter for lack of jurisdiction. Section 1362 of Title 28 provides an independent basis for federal jurisdiction over the Tribe's claims against the State and private landowners. That section provides that "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe . . ., wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362. We believe that the Tribe's claims against the State and the private landowners "arise under" federal law. The Tribe's claims against the State derive from

-20-

the interpretation of the 1867 treaty and the equal footing doctrine. The State believes that it owns the portion of Devils Lake that it did not deed to the federal government in 1971. The claims against the private landowners derive from federal land patents that the government may, or may not, have been empowered to issue. Hence § 1362 establishes a jurisdictional foothold for the Tribe's claims against the State and the private landowners.

The district court dismissed the Tribe's claims against the State and the private landowners after concluding that the federal government was an "indispensable" party in whose absence the action should not be maintained. See Fed. R. Civ. P. 19(b). Because the government was absent for jurisdictional reasons, the court dismissed the Tribe's suit due to its inability to join an indispensable party. See Fed. R. Civ. P. 12(h)(2).

Rule 19(b) authorizes a district court to exercise its equitable powers to dismiss an action if a party regarded as "indispensable" cannot be joined. "Whether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 118 (1968). We therefore review a district court's decision to dismiss an action for failure to join an indispensable party under the highly deferential abuse-of-discretion standard. United States ex rel. Steele v. Turn Key Gaming, Inc., 135 F.3d 1249, 1251 (8th Cir. 1998).

The question posed in the present case is whether the government's absence would render a judgment infirm, defective, or unfairly prejudicial in some fashion. We must emphasize, at the outset, that the federal government and the Tribe possess the primary claims to Devils Lake in this litigation. Neither the State nor the private landowners can be expected to articulate the government's position on its behalf in its absence, so the prejudice to the government is obvious. If the Tribe were to prevail, and gain title to Devils Lake, the government's claim would be extinguished before it

had ever raised its arguments on the merits. Moreover, the district court could not possibly craft an effective judgment in favor of the Tribe if the government would not be bound by that judgment due to its non-joinder.

Although a determination of indispensability in one case will seldom be completely dispositive in another,[6] our consideration of similar cases buttresses our view that the district court properly dismissed the Tribe's remaining claims. We note in particular two cases involving similar land claims brought by Indians against the federal government.

In <u>Manypenny v. United States</u>, thirty-five enrolled members of the White Earth Band of Chippewa sued the federal government (including the Department of Interior and several of its employees), the State of Minnesota and its agents, three Minnesota counties, and an array of private landowners seeking to quiet title to several properties. 948 F.2d 1057 (8th Cir. 1991). The district court dismissed the federal government because it had not waived its sovereign immunity. The court also dismissed the State after applying principles of Eleventh Amendment immunity. Finally, in the absence of the federal government, the court dismissed the remaining counties and private landowners under Rule 19(b). <u>Id.</u> at 1059. On appeal, we affirmed the district court's judgment that the members' inability to join the federal government was fatal to the maintenance of their quiet title action against other parties. <u>Id.</u> at 1067.

---

[6]We reject the notion that the United States is an indispensable party to every case involving a dispute over Indian lands. <u>See</u> <u>Carlson v. Tulalip Tribes of Wash.</u>, 510 F.2d 1337, 1339 (9th Cir. 1975) (noting that "the United States is a necessary party to any action in which the relief sought might interfere with its obligation to protect Indian lands against alienation."). Disputes over Indian lands arise in many forms (and can be initiated by many parties), and hence it is impossible to declare a *per se* rule that deems the government's joinder necessary in all such cases. <u>See, e.g.</u>, <u>Sokaogon Chippewa Cmty. v. State of Wis.</u>, 879 F.2d 300, 304-305 (7th Cir. 1989); <u>Puyallup Indian Tribe v. Port of Tacoma</u>, 717 F.2d 1251, 1254-55 & n.1 (9th Cir. 1983).

Another case presents a more striking analogy to the situation we face in the present case. In Navajo Tribe of Indians v. State of N.M., the Navajo Tribe sued the federal government, the State of New Mexico, and various private landowners seeking to quiet title to thousands of acres allocated to the Navajo Tribe in a 1907 Executive Order. 809 F.2d 1455, 1462 (10th Cir. 1987). A year after the Executive Order issued, the President issued a superseding Executive Order that appeared to revoke the 1907 grant. The Navajo Tribe challenged the validity of the superseding Executive Order in its 1982 lawsuit. The district court held that the federal government was immune from suit because the Tribe's claim fell within the exclusive jurisdiction of the ICC. The court then determined that the government was an indispensable party to the Navajo Tribe's suit, and the court dismissed the remaining defendants under Rule 19(b). See id. at 1471-73. On appeal, the Tenth Circuit affirmed, reasoning that the government is an indispensable party when its own interest in land is plainly adverse to the interests of an Indian tribe. Id. at 1473.

Manypenny and Navajo Tribe illustrate that when the government claims an interest in land that squarely conflicts with the interest of a Tribe, the government's presence in litigation is nearly always required to assure the proper and effective adjudication of the dispute. We find that rationale to be persuasive in this case. As we explained above, the government and the Spirit Lake Tribe have articulated competing claims to Devils Lake. We therefore hold that the district court did not abuse its ample discretion in dismissing the Tribe's claims against the State and various private landowners due to its inability to join the federal government.

IV

For the reasons expressed above, we vacate the portion of the district court's judgment resolving the Tribe's claim against the United States. We remand the matter to enable the district court to dismiss the government as a defendant for lack of subject matter jurisdiction. In all other respects, we affirm the judgment of the district court.

BRIGHT, Circuit Judge, dissenting.

This case has been in litigation for fifteen years. In 1989, the district court rejected the Tribe's claims on the merits, ruling that the government had paid for the lakebed. Devils Lake I, 714 F. Supp. 1019 (D.N.D. 1989). We reversed, ruling that summary judgment was inappropriate since, as we stated, "The facts of the instant case suggest that the parties may have deliberately excluded the lakebed from the 1977 settlement because they considered it part of the Reservation. Admitting such a possibility, it would be counterintuitive to conclude as a matter of law that the parties intended the 1977 settlement to prevent the Tribe from asserting a subsequent claim to the lakebed." Devils Lake II, 917 F.2d 1049, 1056 (8th Cir. 1990). The opinions in Devils Lake I and Devils Lake II assumed jurisdiction rested with the court to decide the merits.

Since that time, the parties negotiated but have failed to reach a settlement. Now, after fifteen years, the majority, in effect, states that there is no decision here, and the title of the Devils Lake lakebed remains in limbo. It tells the parties that the federal courts will not decide the title dispute. To me, it is analogous to two boxers who have fought for fifteen rounds only to hear the judges say "we decline to decide who wins and we send the fighters to box in another ring."

I respectfully dissent from the majority's opinion. The issue is when did the Tribe know or when should it have known that the United States claimed the lakebed of Devils Lake. In my view, the Tribe did not know and would not have known of the government's adverse claim until 1981, when the official position of the United States changed from its view that the Tribe owned the lakebed to a view of "no definite position" on title to the lakebed.

We commented on the official position of the United States in Devils Lake II, 917 F.2d 1049 (8th Cir. 1990). This court determined that in 1976 the Department of

-24-

the Interior issued an opinion, authored by an Associate Solicitor for Indian Affairs (Reid Peyton Chambers), which concluded that Devils Lake is wholly within the Reservation boundaries and the United States holds title to the lakebed in trust for the Tribe. Id. at 1052-53. The panel noted that the United States asserted this position in subsequent litigation, but ultimately abandoned it. Id. at 1053 n.6. The panel concluded that the government's opinion was communicated to the Tribe later in 1976, but, in 1981, the government withdrew support from its 1976 opinion. Id. at 1054.

Associate Solicitor Chambers' letter stated as follows:

By Memorandum dated February 13, 1976, you requested my assistance in determining the status of the title to the bed of Devils Lake in North Dakota. . . . [T]he Attorney General [of North Dakota] also requested an opinion as to the location of the "lakeside boundary" of the Fort Totten Sioux Indian Reservation which, in the Attorney General's view, is located "on the shore of Devils Lake."

I am of the opinion that Devils Lake is not adjacent to the Fort Totten Sioux Indian Reservation but wholly within its boundaries and the United States holds title to the lakebed in trust for the Devils Lake Sioux Tribe.

Tribe App. at 74.

Therefore, the conveyance by the State of North Dakota in 1971was a conveyance of whatever interest the State possessed in the lakebed. The State may have thought it possessed title to the lakebed but title never had been confirmed to the State. The 1971 quitclaim may have been a move to satisfy the paper requirements for the Garrison Diversion Project, but binding the Tribe to it is another question altogether.

Subsequently, in a 1981 letter, the Department of the Interior advised the Land and Natural Resources Division of the Department of Justice on the question of

whether the State acquired the bed of West Bay, Devils Lake as an incident of statehood. The Department saw

> no need to take a definitive position on the title to the entire lakebed at this time. If and when these issues arise in litigation of interest to the Tribe, they will be fully addressed by this Department. Meanwhile, the June 21, 1976 memorandum of the Associate Solicitor, Indian Affairs, should no longer be relied upon as stating the position of this Department on the ownership of the Lakebed.

Tribe App. at 222.

The State's 1971 conveyance was not mentioned in the 1981 letter. Obviously, the federal government placed no importance upon this conveyance by North Dakota to the United States as shown by the utter lack of mention of the conveyance in the official correspondence regarding ownership of the lakebed.

In my judgment, upon review of these letters, it is clear the Tribe would not have received a definitive answer from the United States as to ownership of the lakebed if it had asked for direction in 1981. The United States did not know, nor had it determined, ownership of the lakebed. As a result, applying the statute of limitations at this late stage is wrong. In essence, the Tribe did not know and could not know of an adverse claim to the lakebed by the United States, at any time prior to at least 1981 or later.

My position is supported by the cases in the Ninth Circuit, <u>Michel v. United States</u>, 65 F.3d 130 (9th Cir. 1995) (per curiam), and <u>Schultz v. Department of Army</u>, 886 F.2d 1157 (9th Cir. 1989), which treat analogous situations. The majority cites <u>Michel</u> for the proposition that the governing legal framework for this case is that when the government abandons its interest in land, a new twelve-year period begins in which

a plaintiff may file a Quiet Title Act action against the government once the government reasserts an adverse claim. See also Schultz, 886 F.2d at 1161 ("[i]f the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted.") However, the majority's assumption that the United States had property to abandon is misguided. The Tribe's "treaty or aboriginal title" to the lakebed was conceded for purposes of the United States' summary judgment motion, and the merits of that issue still have not yet been litigated. The majority does not reach the Tribe's alternative theory that the Tribe retained aboriginal title to the submerged lands, which cannot be extinguished without explicit action by Congress. Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 667-68 (1974).

Applying the Ninth Circuit cases, the Department of Interior's 1981 letter reasserts a new status of the lakebed because it indicated the status quo for the government's view of the ownership of the lakebed had changed from conviction that the Tribe owned it to saying that the government took no definitive position, i.e., it did not know. The statute of limitations should have begun, at the earliest, in 1981 or later. The record does not show prior to the lawsuit why or when the United States claimed ownership of the lakebed. The issue is not abandonment of rights by the government, or whether its 1976 position binds the government, about which the majority engages in mere conjecture as there is simply no testimony in the record to support these assumptions. The government was not giving anything up in its 1981 letter; rather, its position was that it didn't know. The United States, at no time prior to 1981, made any claim to the lakebed. Indeed, as we have observed, the United States recognized that the Tribe could claim ownership.

I reject a *per se* rule of nonjusticiability that fails to consider adequately the Tribe's history of reliance on the government, as trustee, acting in its interests. Nor would I give credence to the claim that, prior to 1971, the Tribe understood the adverse character of the federal government's claim to Devils Lake.

-27-

An important question, as I see it, is whether there was any reason for the Tribe not to rely on its trust relationship with the federal government, when the State of North Dakota in 1971 quitclaimed more than 62,000 acres of the lake to the United States for the Garrison Diversion Project, and when interpreting the government's 1976 and 1981 memos regarding the reservation boundaries.[7]  Further, it is well-documented that the Tribe historically relied on the federal government to manage day-to-day Reservation affairs, and the Tribe had a right to think that the government was not cheating it out of ownership of the lakebed but would protect the Tribe's interests.

Where does this leave us?  The undisputed facts show the Tribe filed its lawsuit in 1986, within twelve years of the government's "I don't know" pronouncement in 1981 that its 1976 memorandum "should no longer be relied upon as stating the position of this Department on the ownership of the lakebed."  Thus, the Tribe's lawsuit is timely.

Unfortunately, as a result of the majority's conclusion that the court may properly dismiss the claims against the government for lack of jurisdiction, the ownership of the Devils Lake lakebed remains in limbo.  The State of North Dakota, for example, stands on uncertain ground now as to the parts of the lake it did not quitclaim to the United States in 1971, and, in that respect, the district court abused its discretion in dismissing all of the Tribe's claims against the State because the federal government is not an indispensable party as to all parts.

---

[7]The majority characterizes the dispute concerning ownership of the lakebed as "long-simmering."  To the contrary, I believe we should take judicial notice that ownership of the lakebed was insignificant until recently, when the level of water rose and Devils Lake became vastly more important for its recreational benefits.  The majority's unanchored interpretation of history ignores that all of this territory in what is now North Dakota belonged to native peoples before the arrival of white settlers. The majority implies that the Tribe's ancestors were getting more than they deserved in the 1867 Treaty because they were beneficiaries of the government's largesse.

The majority substitutes a judgment of dismissal, based on conjecture and ambiguity rather than on the merits, in place of this court's duty to provide the parties their day in court. I respectfully dissent. Justice delayed is justice denied.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.