FILED
United States Court of Appeals
Tenth Circuit

March 26, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

RIO GRANDE SILVERY MINNOW
(*Hybognathus amarus*);
SOUTHWESTERN WILLOW
FLYCATCHER (*Empidonax trailii
extimus*); DEFENDERS OF
WILDLIFE; FOREST GUARDIANS;
NATIONAL AUDUBON SOCIETY;
NEW MEXICO AUDUBON
COUNCIL; SIERRA CLUB; and
SOUTHWEST ENVIRONMENTAL
CENTER,

       Plaintiffs-Appellees,

v.

BUREAU OF RECLAMATION, an
agency of the United States; ROBERT
L. VAN ANTWERP, Lt. Gen., Chief
Engineer, Army Corps of Engineers;
UNITED STATES ARMY CORPS OF
ENGINEERS, an agency of the United
States; UNITED STATES OF
AMERICA; KEN SALAZAR,
Secretary, Department of the Interior;
MICHAEL L. CONNOR,
Commissioner, Bureau of
Reclamation; LARRY WALKOVIAK,
Regional Director, Bureau of
Reclamation; and KIMBERLY L.
COLLOTON, Lt. Col., Albuquerque

No. 05-2293

District Engineer,[*]

      Defendants-Cross-Defendants-
      Appellees,

THE MIDDLE RIO GRANDE
CONSERVANCY DISTRICT,

      Defendant-Intervenor-Cross-
      Claimant-Appellant,

STATE OF NEW MEXICO; RIO DE
CHAMA ACEQUIA ASSOCIATION;
CITY OF ALBUQUERQUE,

      Defendants-Intervenors.[**]

—————————————

CITY OF SANTA FE,

      Intervenor.[***]

—————————————

[*]       Pursuant to Fed. R. App. 43(c), we have substituted as the Defendants-Cross-Defendants-Appellees in this action: (1) Robert L. Van Antwerp, Lt. Gen., Chief Engineer, Army Corps of Engineers, for Joseph Ballard, General, Chief Engineer, Army Corps of Engineers; (2) Ken Salazar, Secretary, Department of the Interior, for Gale Norton, Secretary, Department of the Interior; (3) Michael L. Connor, Commissioner, Bureau of Reclamation, for Eluid L. Martinez, Commissioner, Bureau of Reclamation; (4) Larry Walkoviak, Regional Director, Bureau of Reclamation, for Michael R. Gabaldon, Regional Director, Bureau of Reclamation; and (5) Kimberly L. Colloton, Lt. Col., Albuquerque District Engineer, for Tom Fallin, Lt. Col., Albuquerque District Engineer.

[**]       Two of the Defendants-Intervenors, State of New Mexico and City of Albuquerque, entered appearances on appeal but did not otherwise participate. Additionally, Defendant-Intervenor Rio de Chama Acequia Association entered an appearance in the district court but did not participate on appeal.

[***]       Intervenor City of Santa Fe entered an appearance in the district court but

(continued...)

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-99-1320-JP)**

Charles T. DuMars (Christina J. Bruff and David Seeley with him on the briefs), of Law & Resource Planning Associates, P.C., Albuquerque, New Mexico, for Defendant-Intervenor-Cross-Claimant-Appellant Middle Rio Grande Conservancy District.

Jennifer Scheller Neumann, Attorney, U.S. Department of Justice, Environment & Natural Resources Division, (Ellen S. Durkee and Andrew Smith, Attorneys, U.S. Department of Justice, Environment & Natural Resources Division; Sue Ellen Wooldridge, Assistant Attorney General; Megan Walline, Attorney, Office of the Solicitor, Department of the Interior, with her on the brief), Washington, D.C., for Defendants-Cross-Defendants-Appellees.

Alletta Belin of Belin & Sugarman, Santa Fe, New Mexico (Laurence ("Laird") J. Lucas of Advocates for the West, Boise, Idaho, with her on the brief), for Plaintiffs-Appellees.

Before **HENRY**, Chief Judge, **BALDOCK** and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

The Middle Rio Grande Conservancy District ("MRGCD") challenges a final judgment entered on its cross-claims brought pursuant to the Federal Quiet Title Act of 1972 (the "QTA"), 28 U.S.C. § 2409a, in favor of the Secretary of the Interior Ken Salazar, the Bureau of Reclamation ("BOR"), BOR officials, the United States Army Corps of Engineers ("Corps"), and Corps officials (collectively the "federal appellees").

---

[***](...continued)
did not participate on appeal.

3

Specifically, following a bench trial, the district court held that MRGCD's claims were time-barred pursuant to 28 U.S.C. § 2409a(g). The court ruled in the alternative that, even if its claims were not time-barred, MRGCD was judicially estopped from claiming that it owned the properties in question, and, furthermore, the federal appellees were entitled to judgment on the merits. As to the limitations issue, we agree with the district court: MRGCD's quiet-title action is time-barred. It follows, however, that the district court did not have jurisdiction to decide the merits of that action. Therefore, we remand to the district court with instructions to vacate the portion of its judgment that resolves the merits of MRGCD's quiet-title action and to enter judgment on its jurisdictional dismissal of the claim.

## I. BACKGROUND

"We begin with a comprehensive appraisal of the trial evidence, viewed through the proper evidentiary prism. That is to say, we review the record evidence in a light most favorable to both the district court's subsidiary and ultimate findings." *Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 858 (10th Cir. 2008). We highlight the features of the case that are most pertinent to our analysis of the QTA statute-of-limitations issue.

MRGCD was formed in 1925 to consolidate water rights and irrigation systems in the Middle Rio Grande Valley. In the 1930s, MRGCD built the El Vado Dam and Reservoir ("El Vado") and diversion dams in New Mexico at Cochiti, Angostura, Isleta, and San Acacia. Essentially bankrupt by the 1940s, MRGCD defaulted on its bonds and was unable to repair and maintain its facilities. Financial difficulty, combined with

4

aggradation of the river channel and consequent flooding, resulted in development of the Middle Rio Grande Project ("Project") by the BOR and the Corps. The Project was designed to rehabilitate and construct irrigation facilities, control flooding and sedimentation on the river, and improve the economy in the Middle Rio Grande Valley. The 1947 BOR Plan for Development contemplated as "an important and necessary part of the plan" that the United States would acquire "the existing works" of MRGCD. Aplt. App. at 1485. Moreover, the plan expressly identified the "principal features" of MRGCD to include, *inter alia*, the following: El Vado; the Cochiti, Angostura, Isleta, and San Acacia Diversion Dams; 767 miles of canals, acequias, and laterals; 342 miles of drains; and 180 miles of riverside levees. *Id.* at 1499.

The Flood Control Act of 1948, Pub. L. No. 80-858, § 203, 62 Stat. 1171, 1179, expressly incorporated the BOR and Corps plans for the Middle Rio Grande. The Act further authorized the United States to acquire the "bonds and other evidences of indebtedness of [MRGCD] . . . for the protection of the investment of the United States." § 203, 62 Stat. at 1179. MRGCD was required to reimburse the United States for some of the improvements made to the Project works.

After Congress authorized the Project, the United States and MRGCD executed a contract ("1951 Contract"). The 1951 Contract contained several provisions relevant here. Pursuant to Article 26:

> [MRGCD] *shall convey to the United States with title satisfactory to the Contracting Officer such of [MRGCD] works now owned by [MRGCD]*, as shall be required to be conveyed to the United States

5

as determined by the Contracting Officer.  But this contract is executed upon the express understanding and condition that while the legal title to [MRGCD] works conveyed to the United States under the terms of this contract or by any separate instruments executed pursuant to its terms may continue thereafter in the United States, upon full compliance by [MRGCD] with all covenants required to be performed by it under the terms hereof, including the repayment in full to the United States of all sums of money and at times, and on conditions as herein provided, *and on consent of Congress*, the United States will reconvey to [MRGCD] all [MRGCD] works transferred to the United States, under the provisions of this contract, and additions thereto . . . .

Aplt. App. at 1666–67 (emphasis added).[1]  Moreover, Article 27 stated:

The United States shall not commence construction of any feature of the project within the boundaries of [MRGCD] until all necessary rights of way therefor have been secured [by MRGCD], or satisfactory contracts entered into for the purchase thereof . . . .  All other rights of way required for constructing the reimbursable features of the project shall be acquired as hereinafter provided and payment made therefor by the United States and costs thereof in the amount so paid shall be a part of the reimbursable construction costs of the [P]roject.

*Id*. at 1667.  Lastly, noting that MRGCD had "made certain water filings including filings for storage and use of water in the El Vado Reservoir," the 1951 Contract required MRGCD to assign "any and all such filings" to the United States.  *Id*.

---

[1]    MRGCD's Board of Directors expressed reservations when presented with a proposed contract containing terms conveying title to the United States.  However, Board minutes reflect that while the Board did have these concerns, its members also clearly understood that the United States would not conduct work on the Project unless MRGCD transferred title and that MRGCD could not regain title absent an act of Congress.  The United States insisted that, "in accordance with Reclamation Law," even when the 1951 Contract was fully repaid, the United States would hold legal title to the Project properties until Congress voted to reconvey it.  Aplt. App. at 1643.  Although MRGCD suggested the addition of language providing that equitable title revert to it on full repayment, such language is absent from the executed document.

Article 29 provided that "[t]itle to all works" that the United States "constructed" under the contract, as well as to works that MRGCD conveyed to it, shall "continue to be *vested in the name of the United States* until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to [MRGCD] for operation and maintenance." *Id*. at 1668 (emphasis added). Additionally:

> The term construction, as used in this contract, shall consist of rehabilitation and extension of the irrigation and drainage system of [MRGCD], rehabilitation and repair of El Vado Dam, repairs to diversion dams and related irrigation and drainage structures; acquisition of outstanding bonds; and rectification of the Rio Grande Channel.

*Id*. at 1657.

Ultimately, the United States funneled more than $231 million into the Project. MRGCD, by comparison, was obligated to reimburse approximately $15,709,000 over around a fifty-year period.

Because preparing complete legal descriptions of the thousands of properties constituting the Project's works would have delayed construction, the parties settled on an interim solution—a blanket Grant of Easement ("1953 Grant of Easement")—which provided:

> [MRGCD] . . . assigns and conveys to the United States of America all [MRGCD] works *and* real property required for accomplishment of the purposes set forth in that contract between [MRGCD] and the United States dated September 24, 1951 . . . , *together with* the right, privilege and easement to construct, replace, operate and maintain any structure the United States of America may deem necessary or desirable for the construction, operation and maintenance of the [Project] *and* the right, privilege and easement to remove from or

7

place on earth or rock, with the right of ingress or egress for men, materials and equipment for the purposes of carrying out the provisions of that certain contract of September 24, 1951 . . . , in and upon the real estate described in the official maps of [MRGCD], together with all structures on said real estate necessary to the operation of the irrigation and drainage system.

*Id.* at 1721 (emphasis added). The BOR Regional Director opined that the effect of the 1953 Grant of Easement would be to "convey[] all of [MRGCD] works, including El Vado Dam and Reservoir." *Id.* at 1836. In reliance on the 1953 Grant of Easement, very shortly after its execution, BOR officially initiated construction on the reimbursable aspects of the Project. In carrying out this work, BOR needed property interests of third parties, most significantly, rights-of-way, "including easements for ditches, canals, acequias, drains, laterals, [and] roads." *Id.* at 1984. Pursuant to Article 27 of the 1951 Contract, MRGCD was obliged to obtain these interests and assign them to the United States. And it did so throughout the 1950s and thereafter. In 1956, MRGCD specifically agreed that "[a]ll conveyances of easements and interests in land hereafter made by [MRGCD] to the United States pursuant to Article 27 of the basic contract shall be by warranty conveyance." *Id.* MRGCD also "agree[d] that it w[ould] warrant and defend the title to all such easements and interests in land . . . conveyed by it to the United States." *Id.*

In 1955, MRGCD's lawyer informed MRGCD's Board that a BOR lawyer had questioned whether MRGCD should be issuing "any easements, rights-of-way, leases, etc., over and on what was formerly [MRGCD] property since the title has been

8

transferred to the United States of America." *Id.* at 1807. The BOR's lawyer suggested the proper course would be that the United States "grant such easements, rights-of-way, leases, etc. instead of [MRGCD]." *Id.* MRGCD's lawyer opined that this suggestion "has merit for the reason that . . . the title to all the works, including the ditches and rights-of-way and El Vado Reservoir is now vested in the United States of America." *Id.* At a subsequent meeting in 1955, MRGCD's Board took up the subject of the BOR lawyer's suggestion. The Board passed a resolution stating that it was "the consensus of the Board" that it should comply with and implement the BOR lawyer's suggestion "in view of the fact that the title to all the works of [MRGCD] has now vested in the United States of America." *Id.* at 1814. More specifically, they stated that "hereafter all easements, rights-of-way, leases and transfers of any interest in and to the properties which ha[d] been conveyed by [MRGCD] to the United States of America will be submitted, passed upon, and granted at the discretion of the United States of America and not by the Board of Directors of [MRGCD]." *Id.*

The parties never recorded the 1953 Grant of Easement. However, MRGCD urged the United States to do so out of its concern that, absent recordation, third parties would lack notice that "the title to all the works of [MRGCD] is now vested in the United States of America" and, therefore, might seek damages arising from operation of the works from MRGCD. *Id.* at 1815. In August 1955, however, a BOR Field Solicitor, named A.V. Roscoe, recommended in an internal file memorandum that the 1953 Grant of Easement not be recorded because: "[f]rom the language of the Grant of Easement and the [1951

9

Contract], it is evident that the parties thereto did not intend to consummate a present conveyance of specific properties"; and that the 1953 Grant of Easement did not adequately describe the subject properties and therefore could not be effective to apprise third parties of the properties MRGCD *intended* to convey. *Id.* at 1852. In addition, around the same time, in 1955, a BOR Regional Director appeared to question in an internal governmental communication to a federal manager on the Project whether the United States would take fee title or an easement in the Project works. Furthermore, in a 1958 BOR history of the Project, the author refers to court cases in which the United States had filed "motions seeking to have the cases dismissed on the grounds the United States in the maintenance of the works of [MRGCD] . . . is an agent of the State of New Mexico." *Id.* at 2051.

However, in the 1950s and 1960s, without any indication of uncertainty, MRGCD represented to third parties that the United States owned the Project works. The United States did likewise. For example, in 1955, the Chief Engineer of MRGCD testified before Congress that "the United States . . . acquired and now holds title to all of the works of [MRGCD]." *Id.* at 1784. In 1956, to eliminate apparent confusion among local New Mexico officials concerning the extent of its title interest in certain Project properties, the United States sought a resolution from MRGCD's Board that would state that the property at issue "was and is a part of [MRGCD's] works and facilities and was conveyed to the United States." *Id.* at 1973. MRGCD's Board passed such a resolution.

Furthermore, in 1956, the United States publicly took the position in litigation

before the U.S. Supreme Court—*Texas v. New Mexico*, Original Action No. 9—that it was an indispensable party because "the United States has now taken over title to and operation of all the dams and other works of [MRGCD]." *Id.* at 2006. MRGCD also agreed in this litigation that "the United States is now the owner of all the works of the Defendant, [MRGCD], including El Vado Dam and Reservoir." *Id.* at 1866–67. Similarly, in 1967, in another Supreme Court original action—*Texas and New Mexico v. Colorado*, Original Action No. 29—the U.S. Solicitor General offered an assessment of the impact of the litigation on the interests of the United States: "Any ruling touching the [water] delivery obligations of New Mexico, here, as in *Texas v. New Mexico*, would both entail control of the operations of [MRGCD], all of whose dams and other works are *owned* and operated by the United States . . . ." *Id.* at 2366 (emphasis added). In the joint response brief that Texas and New Mexico filed with the Court, they acknowledged the United States's litigation position in the earlier Supreme Court litigation (i.e., *Texas v. New Mexico*): "The United States argued in its final memorandum that at that time (1956), it had *taken title to all of the works of the [MRGCD]*, and that any manner of relief sought by Texas which included control over the gates of El Vado Dam would now be ineffective in the absence of the United States as owner of the works." *Id.* at 2384. In that prior case, Texas and New Mexico noted, "Texas [had] admitted the United States was indispensable because of its *ownership* of the works sought to be controlled." *Id.* (emphasis added).

In further conformity with the parties' intent in executing the 1953 Grant of

11

Easement, around 1962, BOR received county-by-county grants "covering the assignment of all of [MRGCD's] old rights of way," *id.* at 2168, 2180; *see id.* at 2170–74, 2181–90, which were replaced by later-recorded instruments.

In 1960, the United States and MRGCD executed a Grant of Right of Way Easement for El Vado:

> the Grantor does hereby grant, bargain, sell, transfer, assign and convey to the United States and its assigns, an exclusive right, privilege and easement to construct, reconstruct, replace, enlarge, operate and maintain ditches, canals, laterals, drains, aqueducts, water conduits, fences, bridges, roads, telephone and telegraph lines, and any other structures or facilities the United States may deem necessary or desirable for the construction, operation and maintenance of the [Project], and the exclusive right, privilege and easement to remove from or place on earth and rock, with the right of ingress and egress for the purposes of carrying out the easement hereby granted, in and upon lands of [MRGCD] covering the site for El Vado Dam and Reservoir . . . .

*Id.* at 2131–32. The parties intended the conveyance to both describe the real property on which the dam and reservoir was located, and to "return[] to [MRGCD] the mineral rights." *Id*. at 2138. In contemporaneous transactions with third parties, the United States represented that it "owns and controls lands or interest in lands in the El Vado Reservoir Area." *Id*. at 2193, 2202.

In the 1970s, MRGCD continued to recognize that it had conveyed interests in the Project properties to the United States. For instance, in 1972, MRGCD indicated that "[a]ll the ditches, canals, and drains to which [MRGCD] had acquired title have, in turn, been conveyed to the United States Government by virtue of a Rehabilitation Contract."

12

*Id.* at 2414. Similarly, in 1976, MRGCD acknowledged that "the works" of MRGCD "at El Vado Dam" had been transferred to the United States. *Id.* at 2567. Moreover, in 1977, MRGCD's counsel acknowledged in communications to MRGCD's Board that the United States's consent to fencing certain Project property was necessary because the United States held title to it. During this same period of time, the United States continued to assert that it held legal title to the Project properties, including in a 1970 letter to MRGCD's legal advisor. *Id.* at 2404 (recognizing that MRGCD may deem it necessary to join the United States as a party in litigation with third parties, "in view of [the United States's] legal title to the property").

On the other hand, in some communications in the 1980s and 1990s, federal managers working on the project and governmental attorneys either expressed uncertainty concerning the property interest that the United States held in the Project properties, or indicated that the interests were in the form of easements. Some of these communications were to MRGCD or third parties. *See id.* at 2639 (noting, in a 1983 permit agreement entered into by a BOR Projects Superintendent on behalf of the United States with Los Alamos County, New Mexico, and signed in concurrence by MRGCD's General Manager, that MRGCD "is the owner of El Vado Dam and the United States is the operator of El Vado Dam and Reservoir"); *id.* at 2794 (noting, in a 1983 letter from a BOR Regional Director to an engineering company, that "[b]y easement dated February 9, 1960, [MRGCD] conveyed all necessary rights-of-way easements to the United States for construction, operation, and maintenance of the [Project] including facilities at El

13

Vado Dam and Reservoir," and thus MRGCD "continues as legal owner of the facility with an easement interest granted to the United States"); *id.* at 2900 (noting, in a 1990 letter from a federal Project Manager to MRGCD's Chief Engineer, that "[a] field review" by federal employees indicated that MRGCD acquired certain Project property "by fee simple" and "granted the United States an easement interest in 1962").

Other communications were internal governmental communications. *See id.* at 3025 (noting, in an internal 1994 "Determination of Surplus Easement," signed by the BOR Regional Director, among others, that in connection with release of easement in certain Project property that "[a] perpetual easement was acquired by the United States . . . from [MRGCD], the underlying fee owner," for construction and reconstruction work in connection with the Project); *id.* at 3030, 3032 (noting, in a 1994 letter response from a federal attorney to the BOR Regional Director, who had expressed confusion concerning whether the United States or MRGCD "own the actual [Project] facilities," that "title to any facility or portion thereof which was constructed by the United States is vested in the United States" but "title to any facility or portion thereof which was constructed by [MRGCD] is vested in [MRGCD]"). Of particular note, in a 1999 internal communication, Department of the Interior ("DOI") Solicitor John Leshy stated the following: "[BOR's] review to-date indicates no controlling property interest in MRGCD facilities. However, the United States is still in the process of analyzing and assessing the extent to which the aforementioned easements might be exercised." *Id.* at 3186.

Nevertheless, around the same time, MRGCD expressly recognized that the United

14

States claimed title to the Project works. In its 1993 Water Policies Plan, MRGCD acknowledged that although MRGCD "wants title to [MRGCD] property to return . . . automatically when the [MRGCD's] debt . . . is paid off," the United States insisted that "conveyance of . . . assets back to [MRGCD] requires either a determination by the Secretary of Interior that the property is no longer needed for the [Project], or an Act of Congress." *Id.* at 3004. In 1994, in a contract between MRGCD and Public Service Company of New Mexico concerning the storage of water at El Vado, the parties expressly agreed that "the works of [MRGCD] have been transferred by [MRGCD] to the United States Government and are now operated and maintained by [BOR] under contract with [MRGCD]." *Id.* at 3010. Similarly, in 1999, MRGCD reported to the New Mexico Legislature that it had assigned or conveyed to BOR title to many works and that, when the contract was fully repaid, it would be required to "petition the U.S. Congress to consent to the reconveyance of the title to all Project works, including El Vado Dam and the three diversion dams on the Rio Grande (Angostura, Isleta, and San Acacia) to [MRGCD]." *Id*. at 3098. Furthermore, in 2000, in an internal governmental communication, Solicitor Leshy stated: "After carefully reviewing all of the relevant documents, I have concluded that [BOR] obtained title to MRGCD facilities through federal legislation authorizing the Project and subsequent agreements between [BOR] and [MRGCD]." *Id.* at 3186.

On November 15, 1999, several environmental groups filed a complaint in the United States District Court for the District of New Mexico on behalf of the Rio Grande

15

Silvery Minnow seeking declaratory and injunctive relief.[2] MRGCD moved to intervene and subsequently filed a cross-claim in 2002 against the federal appellees to quiet title to El Vado, San Acacia Dam, Angostura Dam, State Water Rights Permit No. 1690, and certain identified tracts of property. Following a bench trial, the district court held that MRGCD's claims were time-barred under the QTA's twelve-year statute of limitations. The court ruled in the alternative that, even if its claims were not time-barred, MRGCD was judicially estopped from claiming that it owned the Project properties, and, furthermore, the federal appellees were entitled to judgment on the merits. MRGCD filed a timely appeal.[3]

## II. DISCUSSION

### A. Standard of Review

We review de novo both the district court's determination of subject-matter jurisdiction and its ruling on the applicability of a statute of limitations. *Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1266 (10th Cir. 2002). "We review the [district] court's findings of jurisdictional facts for clear error . . . ." *Jones v. United Parcel Serv.,*

---

[2]    This litigation has spawned several appeals, including this one: specifically, Case Nos. 05-2293, 05-2399, 06-2020 and 06-2021. For purposes of oral argument, we consolidated all of the appeals. The appeals were not all consolidated for briefing purposes, however. The appeals generated two distinct sets of briefs, one related to this appeal (Case No. 05-2293), and one related to all of the other appeals. This court is adjudicating the issues raised by the other appeals in a separate opinion.

[3]    The plaintiffs environmental groups aligned with the federal appellees on the QTA issues before the district court and have filed a response brief with this court, disputing the grounds of MRGCD's appeal. The principal focus of the environmental groups' brief, however, is not the QTA statute-of-limitations issue.

16

*Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *Vail Assocs., Inc.*, 516 F.3d at 858 (quoting *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 859–60 (10th Cir. 2005)). "We view the evidence in the light most favorable to the district court's ruling . . . ." *Plaza Speedway Inc.*, 311 F.3d at 1266.

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985); *see Manning v. United States*, 146 F.3d 808, 813 (10th Cir. 1998) (quoting *Anderson* for this rule). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse . . . ." *Anderson*, 470 U.S. at 573–74. That proposition holds true, not only when the district court's factual findings are predicated upon assessments of witness credibility, but also when they arise from consideration of documentary evidence. *Id.*; *see La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) ("This admonition applies equally regardless of whether the district court's factual findings are based on credibility determinations or on documentary evidence.").

### B. The Quiet Title Act: Governing Law

The QTA is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983). The QTA provides a limited waiver of the United

17

States's sovereign immunity. *Knapp v. United States*, 636 F.2d 279, 281–82 (10th Cir. 1980). Under the QTA:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest *knew or should have known* of the claim of the United States.

28 U.S.C. § 2409a(g) (emphasis added). "Timeliness under subsection [(g)] is a jurisdictional prerequisite to suit under section 2409a." *Knapp*, 636 F.2d at 282; *accord Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001) ("[T]he QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses."); *Bank One Tex., N.A. v. United States*, 157 F.3d 397, 403 (5th Cir. 1998) ("[B]ecause it circumscribes the scope of a waiver of sovereign immunity, the statute of limitations manifests a jurisdictional prerequisite, rather than an affirmative defense.").

The twelve-year limitations period is strictly construed in favor of the United States. *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 452 (10th Cir. 1985); *see Knapp*, 636 F.2d at 282. The government need not "provide explicit notice of its claim." *Spirit Lake Tribe*, 262 F.3d at 738. For purposes of the QTA's limitations provision, the plaintiff's action accrues when he or she "knew or should have known of the claim of the United States." *Rosette, Inc. v. United States*, 141 F.3d 1394, 1397 (10th Cir. 1998) (quoting 28 U.S.C. § 2409a(g)). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims

18

*some* interest adverse to the plaintiff's."  *Knapp*, 636 F.2d at 283 (emphasis added); *accord Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 595 (D.C. Cir. 2009).

Thus, the starting of the limitations clock is not dependent on the plaintiff knowing the precise nature of the property interest upon which the United States predicates its claim of title.  *See Spirit Lake Tribe*, 262 F.3d at 738  ("The government's claim need not be clear and unambiguous." (internal quotation marks omitted)); *see Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 770 (4th Cir. 1991) ("Assuming *arguendo* that RF & P did not know the exact nature of the government's claim in 1938, it still could not escape the limitations bar, for all that is necessary for accrual is 'a reasonable awareness that the Government claims *some interest* adverse to the plaintiff's.'" (quoting *Knapp*, 636 F.2d at 283) (emphasis added)).  In that regard, the United States need not assert a full legal title in the disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title.  *See Kinscherff v. United States*, 586 F.2d 159, 160 (10th Cir. 1978) (per curiam) (stating that, under New Mexico law, "[t]he interest . . . must be some interest in the title to the property" and that "[a]n attempt to remove a cloud from title presupposes that the plaintiff has some title to defend"); *accord Spirit Lake Tribe*, 262 F.3d at 738 (noting that the government's interest simply must be a "cloud on title," that is, "a reasonable claim with a substantial basis" (internal quotation marks omitted)); *see also Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d

19

1189, 1198 (9th Cir. 2008) ("[T]he QTA limitations period accrues as soon as the United States makes a claim that creates even a cloud on a plaintiff's ownership interest." (internal quotation marks omitted)).

In other words, the United States need not assert that it holds title in fee simple to the property. *See Vincent Murphy Chevrolet Co.*, 766 F.2d at 451 (noting that there was "no dispute" that "the [quitclaim deed] restrictions" asserted by the United States "are 'claims'" under the QTA); *Kinscherff*, 586 F.2d at 161 (quoting portions of the QTA's legislative history to indicate that the statute pertains to claims to title involving less than a fee-simple interest); *accord United States v. Bedford Assocs.*, 657 F.2d 1300, 1316 (2d Cir. 1981) (noting that the QTA "plainly contemplates litigation against the United States to adjudicate disputes about lesser interests" than fee-simple ownership interests). Indeed, "[e]ven invalid government claims trigger the QTA limitations period." *Spirit Lake Tribe*, 262 F.3d at 738; *see Knapp*, 636 F.2d at 279 ("Whether the interest claimed amounts to legal title in the United States is irrelevant if it constitutes a cloud on the plaintiffs' title."); *see also Kingman Reef Atoll Invs.*, 541 F.3d at 1197 ("[T]he crucial issue in the statute of limitations inquiry [under the QTA] is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid." (internal quotation marks omitted)). Thus, "[s]imply put, the limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land." *Spirit Lake Tribe*, 262 F.3d at 732.

"Because § 2409a limits the sovereign immunity of the United States, it must be

20

interpreted according to federal law." *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1387 (10th Cir. 1980); *see Vincent Murphy Chevrolet Co.*, 766 F.2d at 451 (noting that "because it is a federal statute," the QTA "must be interpreted in accordance with principles of federal law"); *accord Bank One Tex.*, 157 F.3d at 403 (quoting *Vincent Murphy Chevrolet Co.*, 766 F.2d at 451). "However, federal courts may properly look to state law as an aid in determining the application of statutory language to specific facts." *Amoco Prod. Co.*, 619 F.2d at 1387. In particular, "questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located." *Id.* But "such state law should be compatible with the purpose of [the legislation so as] to find the rule that will best effectuate the federal policy." *Vincent Murphy Chevrolet Co.*, 766 F.2d at 451 (alterations in original) (internal quotation marks omitted).

## C. The District Court's Ruling

The district court concluded that MRGCD's quiet-title claim was time-barred under the QTA's twelve-year statute of limitations.[4] The court found that "MRGCD has

---

[4]    In addition to its quiet-title action, MRGCD sought declaratory relief, calling upon the district court to interpret key documents related to the property-interest dispute, including the 1951 Contract and the 1953 Grant of Easement. The district court likewise concluded that these claims were time-barred. The court reasoned that "[w]hen a party's claim depends on quieting title against the United States, the QTA provides the exclusive source of the court's jurisdiction, even if that claim is not couched as a claim under the QTA." Aplt. App. at 1207. More specifically, the court noted that "[b]ecause these [declaratory judgment] claims are inextricably linked to the question of whether title to [Project] works and facilities and other properties rests with the United States or MRGCD, the statute of limitations bar against MRGCD's direct quiet title claims under

(continued...)

21

known of the United States' interests, and has actively endorsed that interest, since the early 1950s." Aplt. App. at 1205. As support for its conclusion, the court expressly adopted the forty-seven paragraphs of proposed factual findings that BOR asserted would establish the timing of MRGCD's knowledge that the United States claimed an interest in the title of the Project properties, stating that BOR's proposed findings were "fully supported by the record." *Id.* at 1200.

We have carefully reviewed all of the district court's factual findings that are germane to the statute-of-limitations issue for purposes of determining whether they evince a plausible reading of the record. Several of those findings are especially noteworthy here. The court determined that:

    1.    As far back as 1951, "MRGCD understood that it was required to convey

---

[4](...continued)
the QTA also bars these derivative claims." *Id.* at 1208. The federal appellees contend that MRGCD has not raised a challenge to this ruling on appeal and thus has waived it. *See* Fed. Aplee. Br. at 16 n.3. MRGCD's response to this contention in its Reply Brief is non-responsive and opaque at best. *See* Aplt. Reply Br. at 8 n.1 ("Jurisdiction over the declaratory judgment claims falls under 43 U.S.C. § 390uu."). Even assuming, *arguendo*, that MRGCD has preserved a challenge to the district court's ruling concerning its declaratory judgment claims, we hold that it cannot prevail on this challenge. The determination regarding whether MRGCD's quiet-title claim is time-barred controls the outcome of the related inquiry of whether MRGCD's request for declaratory relief is time-barred. MRGCD's "request for declaratory relief leads directly back to the question of title, and, as such, is inextricably linked to that question," and "since the Quiet Title Act contains a limited waiver of sovereign immunity," it is MRGCD's "exclusive remedy." *Rosette, Inc.*, 141 F.3d at 1396; *cf. Block*, 461 U.S. at 286 (noting that "if a suit is untimely under the QTA, the QTA expressly forbids the relief which would be sought under" the Administrative Procedure Act, 5 U.S.C. § 702 (internal quotation marks omitted)). We ultimately hold that the quiet-title claim is time-barred under the QTA; consequently, MRGCD's declaratory judgment claims are as well.

title to property interests in [Project] properties to the United States as a necessary prerequisite to the initiation of BOR's construction and rehabilitation of the Project under federal reclamation law," *id.* at 1188;

2. Pursuant to Articles 26, 27, and 29 of the 1951 Contract, "MRGCD understood that title for Project properties would be conveyed to the United States in at least three ways: (1) by direct conveyance by MRGCD of its existing property interests; (2) by acquisition from third parties of title to additional property interests necessary for Project purposes and assignment of them to the United States; and (3) by operation of the 1951 Contract upon construction of Project works," *id.* at 1200;

3. "The terms of the 1953 Grant of Easement are not limited to conveying an easement. Rather, the document conveys title to *all* [MRGCD] works and real property needed to carry out the 1951 Contract. . . . Other than the diversion dams and the El Vado Dam and Reservoir, most of the Project 'works' consist of right-of-way easements for ditches, canals, drains, and channels," *id.* at 1186 (emphasis added);

4. "[I]n the late 1950s, MRGCD was made aware of and sometimes expressly acknowledged the United States' continued reliance on the 1953 Grant to Easement and the United States' claim of title to various properties formerly owned by MRGCD," *id.* at 1201;

5. "The United States continued to rely on the 1953 Grant of Easement and to

23

claim title to Project properties even after execution of the 1962 [county-by-county] easements. Likewise, MRGCD never understood the United States to have abandoned its claim of title to Project properties by virtue of the execution of the 1962 grants of easement, as demonstrated by its own public, official statements thereafter," *id.* at 1206–07 (citation omitted); and

6. "[I]nconsistencies in later years"—specifically, in the 1980s and 1990s—in the statements of the United States and MRGCD concerning ownership of one of the most significant Project properties, El Vado Dam and Reservoir, "do not negate federal acquisition of ownership of El Vado Dam and Reservoir that occurred in the 1950s," *id.* at 1196.

In sum, the district court found that "[t]he record is replete with convincing proof that MRGCD had full knowledge [in the 1950s] that the United States claimed title to all [Project] properties." *Id.* at 1200.

The district court rejected several arguments of MRGCD. Significantly, the court rejected MRGCD's contention that "the statute of limitations did not begin to run until 2000 because before that the United States's claim was too ambiguous." *Id.* at 1204. The court noted that to buttress its contention MRGCD "point[ed] to conflicting evidence as to whether the United States was claiming fee title or an easement interest." *Id.* Relying on our *Knapp* decision, the district court found MRGCD's contention to be unavailing. The court noted that in *Knapp* we turned away the argument that "the limitations period began to run only when the government 'definitively asserted an interest greater than a

24

right-of-way.'" *Id.* at 1205 (quoting *Knapp*, 636 F.2d at 282).

The district court also rejected MRGCD's alternative argument that "even if it had notice of the United States's claim of title to [Project] properties, the United States abandoned that claim before the 12-year period expired by accepting and recording the 1962 county-by-county grants of easements as replacements for the 1953 Grant of Easement." *Id.* at 1206. The court observed that the United States must clearly and unequivocally abandon its claim of title to stop the limitations clock from running, and held that MRGCD had made no showing of such abandonment on these facts.

Thus, the district court concluded that, based on the facts of record, MRGCD knew (and thus certainly should have known) that the United States claimed title to the Project properties as far back as the early 1950s, and, thus, MRGCD's 2002 cross-claim was barred by the QTA's twelve-year statute of limitations.

## D. Statute-of-Limitations Analysis

After carefully considering the record, we hold that the district court did not err in determining that MRGCD's 2002 cross-claim was time-barred under the QTA's twelve-year statute of limitations. More specifically, we conclude that the district court did not clearly err in finding that MRGCD knew as far back as the early 1950s that the United States claimed title to the Project properties. In other words, the district court's "account of the evidence is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. We need not (and do not) opine here on the precise nature of the property interests that formed the basis of the United States's claim of title. MRGCD does not

25

dispute on appeal that during the early 1950s it conveyed title to easement interests to the United States. However, it is sufficient for purposes of our QTA limitations analysis to inquire whether the district court made plausible findings, viewing the record as a whole, determining in substance that in the early 1950s the United States asserted a claim of title to the Project properties; that this claim—at the very least—was supported by the United States's asserted possession of *some* property interest that was substantial and adverse enough to cloud title of those properties; and that MRGCD was reasonably aware of that claim. *See Knapp*, 636 F.2d at 283 ("All that is necessary is a reasonable awareness that the Government claims *some* interest adverse to the plaintiff's." (emphasis added)). We answer in the affirmative: there was abundant record evidence that permitted the district court to plausibly make these findings.

Reviewing as we do for clear error, we need not explicate in great detail the evidence demonstrating the significant degree of congruity between our reading of the record—summarized in the Background section, *supra* Part I—and the district court's ultimate and subsidiary findings of fact. It will suffice to underscore several salient points. The district court's reading of key documents in this case—the 1951 Contract and the 1953 Grant of Easement—is certainly plausible and, even viewed alone, makes a compelling case that MRGCD possessed the requisite knowledge as far back as the 1950s. By its plain terms, the 1951 contract called upon MRGCD to convey title to Project properties to the United States. And the district court could plausibly find that the 1951 Contract provided for the United States to receive property interests pertaining to

the Project in three ways: (1) by direct conveyance by MRGCD of its existing property interests; (2) by MRGCD's acquisition from third parties of title to additional property interests necessary for Project purposes and assignment of them to the United States; and (3) by operation of the 1951 Contract, upon the United States's construction of Project works.

Furthermore, significantly, the district court's finding that the 1953 Grant of Easement involved a present conveyance of title by MRGCD of its property interests in Project properties to the United States and that this conveyance involved fee-simple interests, as well as easements, is entirely plausible. The district court supported this finding with a correct observation concerning New Mexico law: "The fact that the 1953 grant is entitled 'Grant of Easement' does not control the nature of the conveyance. The title of an instrument is not determinative of the property interest conveyed by that instrument." Aplt. App. at 1219 (citing *Atl. Ref. Co. v. Beach*, 436 P.2d 107, 110 (1968)). The 1963 Grant of Easement uses the present tense in discussing the assignment and conveyance of MRGCD's property interests to the United States, and, significantly, it explicitly recognizes that MRGCD is conveying real property itself, *in addition to* easements and privileges to use the land. In that regard, as we noted *supra*, the language reads:

> [MRGCD] . . . assigns and conveys to the United States of America all [MRGCD] works *and* real property required for accomplishment of the purposes set forth in that contract between [MRGCD] and the United States dated September 24, 1951 . . . , *together with* the right, privilege and easement to construct, replace, operate and maintain

27

> any structure the United States of America may deem necessary or desirable for the construction, operation and maintenance of the [Project] *and* the right, privilege and easement to remove from or place on earth or rock, with the right of ingress or egress for men, materials and equipment for the purposes of carrying out the provisions of that certain contract of September 24, 1951 . . . , in and upon the real estate described in the official maps of [MRGCD], together with all structures on said real estate necessary to the operation of the irrigation and drainage system.

*Id.* at 1721 (emphasis added). Although we perceive the district court's finding that the 1953 Grant of Easement conveyed in part fee-simple interests to the United States to be a plausible reading of the record, for purposes of our QTA statute-of-limitations analysis it is not necessary for us to definitively opine on that precise issue. Rather, it is sufficient for us in addressing the issues and arguments in this case to credit the district court's necessarily embedded factual determination that the 1953 Grant of Easement conveyed in part *some* substantial possessory property interests to the United States, and not just easements and privileges with respect to the land. It would follow ineluctably that such possessory property interests would be adverse to any claim of fee-simple title by MRGCD in the same Project properties. That MRGCD later supplied county-by-county easement grants to the United States does not weaken this determination. The district court did not clearly err in finding that the record reflects that the parties understood the grants as merely providing detailed legal descriptions of interests already conveyed by the 1953 Grant of Easement.

MRGCD does not deny it was aware of the plain terms of the key documents that we have discussed. Considering those terms, the district court's determination is not

28

clearly erroneous that those documents served to make MRGCD reasonably aware in the early 1950s that the United States made a claim of title to the Project properties based upon its asserted possession of *some* substantial and adverse property interests in those properties.

Furthermore, this is not a case where we are limited to the sometimes-stilted language of transactional documents in divining the extent of the quiet-title plaintiff's knowledge. The district court unquestionably could plausibly find based on this record that during the mid-1950s, MRGCD repeatedly *confirmed* the import of these transactional documents, which were executed a few years prior, through MRGCD's communications and actions—*viz.*, confirmed that it knew that the United States claimed *some* substantial and adverse property interests in the title to the Project properties. Among the many examples, in 1955, the Chief Engineer of MRGCD testified before Congress that "the United States . . . acquired and now holds title to all of the works of [MRGCD]." *Id.* at 1784. In 1956, to eliminate apparent confusion among local New Mexico officials concerning the extent of its title interest in certain Project properties, the United States sought a resolution from MRGCD's Board that would state that the property at issue "was and is a part of [MRGCD's] works and facilities and was conveyed to the United States." *Id.* at 1973. MRGCD's Board passed such a resolution. And very compelling proof is found in MRGCD's representations in the *Texas v. New Mexico* Supreme Court litigation. In representations to the highest Court, MRGCD agreed with the United States that "the United States is now the owner of all of the works of the

29

Defendant, [MRGCD], including El Vado Dam and Reservoir." *Id.* at 1866–67. As examined further below, our review of the record also indicates that the district court could plausibly find that the "inconsistencies" during the 1980s and 1990s in the statements of the United States and MRGCD regarding ownership of El Vado Dam and Reservoir, "d[id] not negate federal acquisition of ownership" of the property "that occurred in the 1950s." *Id.* at 1196.

In sum, we conclude that the district court did not clearly err in finding that MRGCD knew as far back as the early 1950s that the United States claimed some substantial and adverse title interest to the Project properties. Consequently, we hold that the district court did not err in determining that MRGCD's 2002 cross-claim was time-barred under the QTA's twelve-year statute of limitations.

MRGCD challenges the district court's statute-of-limitations ruling on two principal grounds. First, MRGCD alleges that in light of the "fifty years of contradicting claims by the United States and . . . MRGCD as to title," the record could not possibly "lead to the conclusion that either . . . MRGCD or the United States could have had a 'reasonable awareness' that the United States claimed a fee simple interest, not a title to an easement." Aplt. Opening Br. at 65. MRGCD reasons that if the government is not claiming fee-simple title, then a potential plaintiff could hardly be expected to file a quiet-title action to settle that claim. *Id.* at 68–69 ("When the United States does not claim fee title one cannot file a quiet title suit to eliminate their claim."); *see also* Aplt. Reply Br. at 14 ("[O]n what basis should MRGCD have been 'reasonably aware' that [BOR] viewed

30

the 1951, 1953, 1960 and 1962 documents as conveying fee simple title, and not easements.").

MRGCD's first argument is predicated upon the assumption that the only thing that triggers the statute of limitations is an unequivocal claim of fee-simple interest in title to the land. That assumption is misguided. The focus of QTA's statute-of-limitations analysis is different. The precise contours of the claimed property interest in the title need not be clear. *E.g.*, *Knapp*, 636 F.2d at 283. It follows ineluctably that there is no requirement that the United States unequivocally claim a fee-simple property interest in the title to start the running of the limitations period. *E.g.*, *Vincent Murphy Chevrolet Co.*, 766 F.2d at 451; *Kinscherff*, 586 F.2d at 161. All that is required is that the potential plaintiff actually know (or be apprised of circumstances such that the plaintiff should know) that the United States asserts a property interest in the title to the disputed property of sufficient substance and adversity to cloud the title. *E.g.*, *Knapp*, 636 F.2d at 283. Our review of the district court's factual findings leaves us with no doubt that the district court plausibly found that the United States asserted such a property interest.

Even if MRGCD only was reasonably aware that the United States based a claim of title to Project properties on easement interests, we question whether MRGCD could prevail on its first argument. Under New Mexico law, an easement is a property interest of sufficient substance to allow for a quiet-title action. *See Kinscherff*, 586 F.2d at 161 (noting that, under New Mexico law, "[e]asements are real property interests subject to quiet title actions"). An easement may cloud title to property of another. *See* 74 C.J.S.

31

*Quieting Title* § 17 (2009) (noting that "[a]n unfounded claim of an easement may cast a cloud on the title of the servient estate"); 65 Am. Jur. 2d *Quieting Title* § 11 (2010) ("An easement is a proper subject of a suit to quiet title, because an easement is real property." (footnote omitted)); *see also AKG Real Estate, LLC v. Kosterman*, 717 N.W.2d 835, 838 (Wis. 2006) ("An easement (or servitude) is an interest that encumbers the land of another."); *cf.* 65 Am. Jur. 2d *Quieting Title* § 13 (2010) ("A cloud upon title may also be defined . . . as an apparent defect in the title that has [the] tendency, even in a slight degree, to cast doubt upon the owner's title, and to stand in the way of the full and free exercise of his or her ownership."). And under New Mexico law extant during the 1950s, a title could be asserted with respect to an easement. *See Ritter-Walker Co. v. Bell*, 123 P.2d 381, 382 (N.M. 1942) (noting that "[t]itle to an easement passes like title to any other real estate"); *see also S. Union Gas Co. v. Cantrell*, 241 P.2d 1209, 1210, 1213 (N.M. 1952) (resolving a dispute concerning a gas company's "owner[ship] of a right-of-way easement for a high pressure gas pipeline across a certain tract of land now owned by the defendants").

Thus, even if MRGCD was only reasonably aware that the United States asserted a claim of title to the Project properties based upon easement interests, arguably the conditions for triggering the running of the limitations period would be met. Those interests would be substantial enough under New Mexico law to cloud MRGCD's title to

the properties, inhibiting its full exercise of rights with respect to them.[5] However,

ultimately, we need not definitively opine upon this question, which envisions MRGCD's

knowledge of only the conveyance of easement interests to the United States, because that

is not the factual situation here. As noted above, subsumed in the district court's

plausible factual findings was the determination that, pursuant to the 1953 Grant of

Easement, MRGCD was reasonably aware that it was conveying some substantial

---

[5] In its Reply Brief, MRGCD suggests that even if the United States's assertion of an easement interest generally could give a landowner the requisite knowledge to start the QTA limitations clock, it did not do so here because MRGCD would not have viewed easements held by the United States to operate and maintain the Project properties to be "adverse to MRGCD's interests." Aplt. Reply Br. at 10. As support for this suggestion, MRGCD cites to the Ninth Circuit's decision in *Michel v. United States*, 65 F.3d 130 (9th Cir. 1995) (per curiam). We are inclined to view this argument as waived. MRGCD did not cite to *Michel* in its opening brief and did not advance this argument there, and, consequently, BOR has been denied an opportunity to respond to it. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). However, even if we were to consider this argument, it would not avail MRGCD. *Michel* is clearly distinguishable. In *Michel*, it was the private party *plaintiff* who claimed an easement interest in the disputed property, not the United States. 65 F.3d at 131. The Ninth Circuit reasoned that

> when the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, adversely to the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property.

*Id.* at 132 (internal quotation marks omitted). Importantly, the Ninth Circuit did not question that "if a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period." *Id.* That is of course the scenario presented by these facts. Therefore, *Michel*'s holding is inapposite here.

33

possessory property interests to the United States, *in addition to* conveying easements, and that those possessory property interests were adverse to any claim of fee-simple title by MRGCD to the same Project properties and would thus cloud MRGCD's title. Under that view of the record, the requirements for the running of the QTA's limitations period were clearly met. Accordingly, MRGCD's first argument fails.

MRGCD's second argument fares no better. MRGCD argues that the government "acquiesce[d]" in MRGCD's claim of title to the Project properties until 2000, when the DOI's Solicitor John Leshy "reversed position" from his 1999 letter opinion, and then "asserted claim to a fee title interest in the United States."[6] Aplt. Opening Br. at 68. In the 1999 opinion letter, Solicitor Leshy stated the following: "[BOR's] review to-date indicates no controlling property interest in MRGCD facilities. However, the United

---

[6]  Despite MRGCD's reference to New Mexico law concerning a party's "acquiesce[nce] in the title of another," Aplt. Opening Br. at 68, as it unfolds, MRGCD's argument is really one of affirmative governmental abandonment, not acquiescence. To the extent that MRGCD were relying on BOR's purported acquiescence, its argument would be wholly without merit. "It is well established that the United States does not abandon its claims to property by inaction." *Kingman Reef Atoll Invs.*, 541 F.3d at 1199; *see United States v. California*, 332 U.S. 19, 40 (1947) ("The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."); *Double J. Land & Cattle Co. v. U.S. Dep't of the Interior*, 91 F.3d 1378, 1381 (10th Cir. 1996) (rejecting plaintiff's effort to equitably "estop the government from complaining of a trespass" because it, *inter alia*, "would effectively permit the trespasser to enjoy the use of those lands without color of title . . . and without any determination that such transfer would be in the national interest"). The district court correctly interpreted MRGCD's argument as raising a question of governmental abandonment, and rejected it. We ultimately reach the same conclusion.

34

States is still in the process of analyzing and assessing the extent to which the aforementioned easements might be exercised." Aplt. App. at 3186. MRGCD appears to reason that if the United States's position concerning its possession of a claim to fee-title interest in the Project properties had been so inconsistent that the Solicitor had not come to a definitive position on the subject by 1999, then it would be inappropriate and unfair to rule that MRGCD should have been reasonably aware in the 1950s of the United States's assertion of such a fee-title claim. Consequently, until Solicitor Leshy issued his definitive opinion in 2000, reasons MRGCD, the running of the statute of limitations was "interrupted." Aplt. Opening Br. at 68. More specifically, MRGCD asserts that BOR "repeatedly disclaimed any interest other than an easement from the late 1950s until 2000" and each time it did so BOR "thereby abandoned any claim to fee simple title," and the QTA's statute of limitations "commenced anew." Aplt. Reply Br. at 9.

MRGCD places principal reliance on three pieces of evidence:

> (1) affidavit testimony in this case of Garry Rowe, a BOR Albuquerque Area Manager during the 1990s, who stated that during that period "it was [his] understanding that the United States/[BOR] held only an easement interest in the [MRGCD's] works with the exception of the new outlet works for El Vado Dam, and [he] acted accordingly in carrying out [his] duties," Aplt. App. at 3286–87;
>
> (2) the 1955 memo to the file of A.V. Roscoe, an attorney in the DOI Field Solicitor's Office, which advised against recording the Grant of Easement

35

because, *inter alia*, "there [wa]s no agreement between the parties as to what [wa]s *intended* to be conveyed," *id.* at 1853 (emphasis added); and (3) the 1958 BOR history of the Project in which the governmental author refers to litigation in which the United States had filed "motions seeking to have the cases dismissed on the grounds the United States in the maintenance of the works of [MRGCD] . . . is an agent of the State of New Mexico," *id.* at 2051.

MRGCD also cites to various communications from the late 1980s through the 1990s—a significant number of them intra-governmental—from federal managers handling transactions involving Project properties to support the proposition that "[w]ith a few minor exceptions, in the 1980's and 1990's, [BOR] gave consistent indications to the effect that it did not own MRGCD property but held only an easement." Aplt. Opening Br. at 67.

MRGCD's second argument is problematic and flawed in several ways. Initially, it operates from the same assumption as the first argument: that is, the assumption that, for QTA limitations purposes, the only property-interest claim against title that starts the limitations clock is a claim involving an unequivocal assertion of a fee-simple interest. Under that assumption, MRGCD views the year 2000 as the critical turning point because that is when the United States—in MRGCD's view—first unequivocally asserted a claim to a fee-simple interest. However, as noted above, this assumption is misguided. To start the limitations clock, the United States did not have to assert an unambiguous claim

36

amounting to a fee-simple interest.

Further, the federal appellees appear to accurately identify two evidentiary failings of this argument. First, as to the three principal governmental statements upon which MRGCD relies, the federal appellees note that "there is no evidence that MRGCD knew of any of these statements during the relevant time period [of the 1950s], or that if MRGCD knew of them, that it believed that they indicated that the United States was not claiming title to the project works." Fed. Aplee. Br. at 19. MRGCD does not dispute this assertion in its Reply Brief. If MRGCD was not aware of any of the statements, they certainly could not have led MRGCD to believe that the United States had abandoned its claim against the title to the Project properties.

The federal appellees' second contention focuses on the evidence of the statements of federal governmental employees from the 1980s and 1990s that appear to question the extent of the property interest possessed by the United States in the Project properties. The federal appellees suggest that if the district court's finding of the requisite knowledge by MRGCD in the 1950s is not clearly erroneous—as we have determined here—then "the QTA's twelve-year statute of limitations had long since run by the time of these statements." *Id.* Consequently, reason the federal appellees, the statements "are irrelevant to the question of when MRGCD became reasonably aware of the United States's claim to title." *Id.* In its Reply Brief, MRGCD does not directly confront this assertion, but MRGCD does seek to fatally undermine the implicit premise of a continuously running limitations period. As noted, MRGCD contends that each time

37

BOR "disclaimed any interest other than an easement from the late 1950s until 2000," the United States abandoned its claim and the QTA's limitations period "commenced anew." Aplt. Reply Br. at 9. However, as we next discuss, MRGCD's reliance on these statements—as well as the statements from the 1950s—to support its abandonment argument is legally misguided. Consequently, the United States's contention that the statements from the 1980s and 1990s are essentially irrelevant because the QTA's statute-of-limitations period had already run is persuasive.

We conclude that, to the extent that MRGCD's abandonment argument rests on statements from federal governmental officials (allegedly disclaiming a fee-simple interest), it is legally flawed. "In the first place, the Government cannot abandon property without congressional authorization." *Warren v. United States*, 234 F.3d 1331, 1338 (D.C. Cir. 2000); *see Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917) ("[R]epeated decisions of this court have gone upon the theory that the power of Congress is exclusive and that only through its exercise in some form can right in lands belonging to the United States be acquired."). "Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution." *Royal Indem. Co. v. United States*, 313 U.S. 289, 294 (1941) (citing U.S. Const. art. IV, § 3, cl. 2); *see Spirit Lake Tribe*, 262 F.3d at 740 ("The Property Clause of the Constitution invests Congress with plenary power to dispose of real property belonging to the United States.").

Indeed, in the QTA, Congress has provided a formal mechanism whereby the

38

United States during the course of QTA litigation, but "prior to the actual commencement of the trial," may "disclaim[] all interest in the real property or interest therein adverse to the plaintiff" and secure an order from the court confirming the disclaimer. 28 U.S.C. § 2409a(e); *see Kingman Reef Atoll Invs.*, 541 F.3d at 1200 (noting that Congress "established a formal method for the United States [during QTA litigation] to disclaim any interest in property, specifically by filing such a disclaimer with the court"). If the United States follows this path, "the jurisdiction of the district court shall cease" under the QTA. 28 U.S.C. § 2409a(e). We may assume—*without* definitively deciding—that

> the principle espoused in § 2409a(e) applies, by analogy, to situations in which a plaintiff has not yet filed a QTA suit (though the limitations period has been triggered by adverse government conduct). In those situations, the government's outright abandonment effectively removes the cloud on a plaintiff's title and extinguishes his obligation to file a quiet title action within 12 years. If the government later reasserts an adverse claim, the reasserted claim is properly regarded as a new claim and a new 12-year period begins in which a plaintiff may file his QTA action against the government.

*Spirit Lake Tribe*, 262 F.3d at 739; *see Kingman Reef Atoll Invs.*, 541 F.3d at 1201 (endorsing a similar approach).

However, "[s]ubordinate officers of the United States are without th[e] power" to "release or otherwise dispose of the rights and property of the United States," except "as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." *Royal Indem. Co.*, 313 U.S. at 294. Furthermore, ordinarily, federal agencies "bind the government" through formal rulemaking or adjudicatory proceedings.

39

*Spirit Lake Tribe*, 262 F.3d at 741. "Unlike rules and adjudications, . . . informal agency pronouncements," including opinion letters, "lack the force of law." *Id.* (internal quotation marks omitted) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)); *see also Kingman Reef Atoll Invs.*, 541 F.3d at 1201 ("Congress did not deem unofficial statements by government officials to be sufficient to eliminate the United States's claim of interest in property and to thus deprive the district court of jurisdiction under the QTA.").

In the QTA context, some of our sister circuits have held that a clear-and-unequivocal standard should be controlling in the assessment of whether the government has abandoned through its statements or actions a previously asserted claim of title to disputed property; they appear to reason that a rigorous test of this sort is necessary and appropriate because the effect of such an abandonment would be to expand the time-window for bringing suits against the government—*viz.*, the effect would be to relinquish some measure of the sovereign's immunity from suit. *See Kingman Reef Atoll Invs.*, 541 F.3d at 1201 ("[T]he United States cannot be deemed to have abandoned a claim of ownership for purposes of § 2409a(g) unless it *clearly and unequivocally* abandons its interest, as evidenced by documentation from a government official with authority to make such decisions on behalf of the United States." (emphasis added) (citation and internal quotation marks omitted)); *Spirit Lake Tribe*, 262 F.3d at 739 ("Like any private citizen or corporate entity, the government may abandon its interest in land. If the government *clearly and unequivocally* abandons its interest, a district court loses

40

jurisdiction over a pending QTA action." (emphasis added)).

We believe that the reasoning of these cases is cogent. It squares with the legion of controlling cases holding that waivers of sovereign immunity exposing the United States to suit must be clear and unequivocal. *See, e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996) (noting as " firmly grounded in our precedents" the proposition that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text"); *United States v. Murdock Mach. & Eng'g Co. of Utah*, 81 F.3d 922, 930 (10th Cir. 1996) ("The government consents to be sued only when Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text. If waiver is not unequivocal from the text, the government retains its sovereign immunity." (citation and internal quotation marks omitted)); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 9.2.1, at 629 (5th ed. 2007) ("The waiver of sovereign immunity by Congress must be explicit.").

Applying these principles here, our close review of the record reveals no statement by any congressionally authorized governmental officer providing that the United States intended to abandon its claim of title to the Project properties. In particular, MRGCD does not contend that Congress authorized Solicitor Leshy to abandon the United States's claim of title to the Project properties. Given that the governmental actors doing the communications were "[s]ubordinate officers of the United States," such congressional authorization would have been an essential requirement for them to effectuate an abandonment. *Royal Indem. Co.*, 313 U.S. at 294. Similarly absent from the record is a

formal agency ruling or adjudication stating that the United States abandoned its claim.

A significant number of the communications that MRGCD relies upon are internal governmental communications. They include most notably the 1999 letter opinion of Solicitor Leshy, upon which MRGCD places great weight. *See* Aplt. Opening Br. at 65–66 ("The clearest argument against . . . MRGCD's obligation to have been 'reasonably aware' the [BOR] claimed fee simple title, was made by Solicitor Leshy himself."). However, "intra-office memoranda," and similar intra-governmental communications "do not bind the government," such that they can effect an abandonment of property and stop the QTA's limitations clock. *Spirit Lake Tribe*, 262 F.3d at 742; *see Kingman Reef Atoll Invs.*, 541 F.3d at 1201; *cf. Aulston v. United States*, 915 F.2d 584, 595 n.16 (10th Cir. 1990) (observing that "[t]he rationale for disregarding internal memoranda in determining agency positions for purposes of deference" is centered in part on the fact that the views expressed in such memoranda have not "long been a matter of public record and discussion" (internal quotation marks omitted)). "[W]here the United States's claim of interest in property stems from formal actions of the legislative or executive branch, [as here,] a person could not reasonably conclude that informal remarks of agency personnel or internal agency memoranda could eliminate the cloud upon the property's title." *Kingman Reef Atoll Invs.*, 541 F.3d at 1200; *see Sprit Lake Tribe*, 262 F.3d at 741–42 (noting that "informal agency pronouncements," like opinion letters, do not have the force of law and that "intra-office memoranda do not bind the government"). Accordingly, MRGCD's reliance on the statements of federal governmental officials to

support its abandonment claim is misplaced.

Furthermore, by its plain terms, the 1951 Contract conditions the United States's release of its interests in the Project properties "on consent of Congress." Aplt. App. at 1667. The record establishes that MRGCD's Board was well aware of this condition; indeed, it was incorporated into the contract instead of MRGCD's suggested language, which would have allowed the properties to revert back to MRGCD merely based upon MRGCD's payment of its loan to the government. *See supra* note 1. Given this explicit contractual condition, "whatever the intent or opinions of individual government officials," *Knapp*, 636 F.2d at 283 n.2, it would not have been reasonable under the circumstances here for MRGCD to believe based upon informal communications of individual governmental officials that the United States had relinquished its claim of title to the Project properties, such that the limitations clock would cease to run.

Lastly, even if the federal officials identified by MRGCD were authorized to abandon the United States's claim of title to the Project properties, and their communications were of sufficient formality to have that effect, MRGCD could not establish that any of the communications—viewed individually or in the aggregate—clearly and unequivocally abandoned the properties. The most that the record would ever support is the contention that the United States's actions and communications expressed mixed messages concerning the nature of the title interest that it claimed in the Project properties. Indeed, MRGCD tacitly concedes as much by arguing that there were "fifty years of *contradicting claims* by the United States and . . . MRGCD as to [fee-

43

simple] title" to the Project properties. Aplt. Opening Br. at 65 (emphasis added). Given their conflicting nature, such governmental communications hardly could qualify as a clear and unequivocal statement of abandonment by the United States of its claim of title to the Project properties. *See Kingman Reef Atoll Invs.*, 541 F.3d at 1201 ("[T]here is no evidence in the record that an appropriate government official clearly and unequivocally abandoned the United States's interest in Kingman Reef. The district court found that [the plaintiff] presented evidence only of confusion and mistake on the part of some government employees, as to whether the United States ultimately possessed an ownership interest in Kingman Reef, and this conclusion is not clearly erroneous." (citation and internal quotation marks omitted)).

Furthermore, contrary to MRGCD's argument, the effect of any such conflicting communications would not have been to create the basis for MRGCD to delay acting in asserting its claim of title. As the federal appellees have suggested, our precedent does not allow plaintiffs to wait until the adverse claims of title asserted by them and the United States crystallize into well-defined and open disagreements before commencing a quiet-title action. *See Rosette, Inc.*, 141 F.3d at 1398 ("The Quiet Title Act is clear that a claim accrues when the plaintiff knew or should have known of the United States' interest. Rosette knew of the United States' interest in 1978, and it does not dispute this. The fact that it decided not to contest that interest until a disagreement arose cannot defeat the workings of the statute of limitations."). Indeed, the effect of the conflicting communications in this case should have been to make it even more imperative for

44

MRGCD to file a lawsuit to quiet title. That is because the communications would have had the effect of "compound[ing] a pre-existing cloud on title" created by the 1951 Contract and 1953 Grant of Easement. *Spirit Lake Tribe*, 262 F.3d at 744 ("[T]he QTA limitations period begins to accrue when a plaintiff has reason to know of a cloud on his title. The inescapable corollary to this principle is that the QTA limitations period does not stop when government action simply compounds a pre-existing cloud on title." (citation omitted)). In sum, MRGCD's lines of argument in support of its second challenge are without merit and that challenge fails.

In sum, we conclude that the district court did not clearly err in finding that MRGCD knew as far back as the early 1950s that the United States asserted a substantial and adverse claim of title to the Project properties. We conclude that the district court's consequent conclusion that MRGCD's 2002 quiet-title action is time-barred by the QTA's twelve-year statute of limitations is well founded.

### E. Vacatur

Because timely filing of a quiet-title suit against the United States is jurisdictional, "the district court lacked subject matter jurisdiction and properly dismissed the action." *Vincent Murphy Chevrolet Co.*, 766 F.2d at 452. Nonetheless, the district court here also dismissed the case on judicial estoppel grounds and granted judgment to the federal appellees on the merits. Thus, simply affirming the district court's dismissal for lack of subject-matter jurisdiction is an inadequate resolution. Because the district court could not entertain the quiet-title action, we also must conclude that the district court was

45

without jurisdiction to address the merits, as well as the defense of judicial estoppel.[7] *See*

*Spirit Lake Tribe*, 262 F.3d at 745. Whether the case is resolved by a jurisdictional

dismissal or a judgment on the merits is a matter with important implications:

> A dismissal pursuant to § 2409a[(g)] does not quiet title to the
> property in the United States. The title dispute remains unresolved.
> Nothing prevents the claimant from continuing to assert his title, in
> hope of inducing the United States to file its own quiet title suit, in
> which the matter would finally be put to rest on the merits.

*Block*, 461 U.S. at 291–92 (internal footnotes omitted); *see Knapp*, 636 F.2d at 283 ("Our

holding today does not settle plaintiffs' title dispute with the Government. We hold only

that under the time-bar of 28 U.S.C. § 2409a[(g)], the trial court should have dismissed

this quiet title action for lack of subject matter jurisdiction."); *see also Spirit Lake Tribe*,

262 F.3d at 745 (noting that "[t]here is no small difference between a [jurisdictional]

dismissal and summary judgment in this [QTA] context."). Accordingly, the status of the

title to the Project properties must await possible future judicial resolution. And the

district court thus erred by entering judgment on the merits in favor of the United States.

That merits portion of its judgment must be vacated.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Middle

Rio Grande Conservancy District's quiet-title action as time-barred by 28 U.S.C.

§2409a(g). We remand to the district court with instructions to **VACATE** that portion of

---

[7]    Because we find the limitations issue dispositive, we need not address the correctness of the district court's rulings on the remaining grounds.

its judgment quieting title in the United States.[8]

---

[8]       Our clerk's office provisionally denied as inconsistent with our court's panel-assignment practices federal appellees' motion to reassign this appeal to a prior merits panel involved in an earlier phase of the parties' litigation relating to the Project. We decline to reconsider that decision and, in any event, would deny the motion as moot.

47